[No. B182089. Second Dist., Div. Eight. Dec. 20, 2007.]

APOLLO CAPITAL FUND LLC, et al., Plaintiffs and Appellants, v. ROTH CAPITAL PARTNERS, LLC, Defendant and Respondent.

COUNSEL

The Rosen Law Firm, Laurence Rosen; Law Office of Brian Barry and Brian Barry for Plaintiffs and Appellants Scott L. Zimmerman, Delta Capital Partners, Spiga Ltd., Target Growth Fund, Ltd., Next Level Capital Investments, Inc., Shawn Sedaghat, Norman Tulchin and Milton and Rosemary Okun.

The Dressler Law Group and Thomas W. Dressler for Plaintiffs and Appellants Apollo Capital Fund, LLC and Mernoush Mahjobi.

Morgan Lewis & Bockius, Paul A. Richler and David S. Cox for Defendant and Respondent.

OPINION

RUBIN, J.—

## SUMMARY

When their investments in an Internet services company's bridge notes became worthless, plaintiffs in this suit for corporate securities fraud, common law fraud and related claims sued the broker-dealer that was the

placement agent for the bridge note offering. The investors asserted numerous causes of action arising from the transaction, two of them based on failure to register or qualify the securities under federal and state law, and the remainder premised on allegations that the broker-dealer collaborated with others in preparing offering documents for the company's bridge note offering that contained materially false and misleading statements. When the broker-dealer demurred to the third amended complaint, the trial court sustained its demurrers to all causes of action without leave to amend and dismissed the complaint. We hold that:

(1) The complaint sufficiently alleges common law fraud and negligent misrepresentation claims against the broker-dealer based on both oral misrepresentations and written misrepresentations in the offering documents.

(2) The broker-dealer was the placement agent for the company in the securities offerings and had no fiduciary duty to investors who were not its customers. However, because a stockbroker always has a fiduciary duty to his or her customers, the single investor who alleged he had an account with the broker-dealer may amend the complaint, if he can, to allege the existence and nature of the account and his relationship with the broker-dealer at the time of the bridge note offering.

(3) The statute of limitations bars the investors' cause of action for the sale of unregistered securities under federal law.

(4) The investors' cause of action for the sale of securities not qualified in accordance with state law requirements is not preempted by federal law.

(5) The broker-dealer is not liable as a seller of the securities under the statutory provisions making it unlawful to offer or sell a security by means of untrue or misleading statements. (Corp. Code, §§ 25401, 25501.)[1]

(6) No private right of action exists under a statutory provision making it unlawful to knowingly provide substantial assistance to another person in violation of any provision of the corporate securities law. (§ 25403.)

(7) The complaint alleged facts sufficient to support the broker-dealer's liability under a statutory provision making a broker-dealer or agent who materially aids in the sale of securities by means of false or misleading statements jointly and severally liable with the primary violator. (§ 25504.)

(8) The complaint alleged facts sufficient to support liability of the broker-dealer under a statutory provision making any person who materially

---

[1] All statutory references are to the Corporations Code unless otherwise noted.

assists in the sale of securities by means of false or misleading statements, with intent to deceive or defraud, jointly and severally liable with the primary violator. (§ 25504.1.)

## FACTUAL AND PROCEDURAL BACKGROUND

In March 2000, 11 individuals and investment companies (collectively, investors) invested funds totaling $2.84 million in privately offered bridge notes (bridge notes or securities) issued by eNucleus, Inc., a company providing software and Internet services designed to facilitate e-commerce by middle market companies. The company defaulted on the securities and slid into bankruptcy. Under a confirmed plan of reorganization in November 2001, the investors in eNucleus's bridge notes received new common stock for their investment, which was then and remains essentially worthless.

On May 10, 2002, the investors filed a lawsuit against Roth Capital Partners, LLC, a licensed broker-dealer and investment banker which acted as eNucleus's "placement agent" for the sale of the bridge notes.[2] The lawsuit alleged violations of the Corporate Securities Law of 1968 (§ 25000 et seq.), as well as claims for common law fraud and negligent misrepresentation. After demurrers were sustained with leave to amend as to previous iterations of the complaint, the investors filed a third amended complaint (the complaint). The complaint alleged four causes of action under California securities fraud statutes:

—A claim for violation of section 25401, which makes it unlawful to sell or offer to sell a security by means of a written or oral communication containing an untrue statement of a material fact, or omitting a material fact necessary to make the statement not misleading.

—A claim for violation of section 25403, under which a person who knowingly provides substantial assistance to another in violation of any provision of the corporate securities law is deemed to be in violation of that provision.

—A claim for violation of section 25504, which provides that a broker-dealer or agent who materially aids in an act or transaction violating section

---

[2] The investors also sued Vedder, Price, Kaufman and Kammholz, the law firm which represented eNucleus in the transaction, and Greenberg Traurig, the law firm which acted as counsel for Roth in the sale of the securities. The law firms settled with the investors after this appeal was filed and briefed. The original complaint also named as defendants various officers and directors of eNucleus. The actions as to those defendants were terminated variously by dismissals or default judgments.

25401 (prohibiting the sale of securities by means of untrue or misleading statements) is liable jointly and severally with the primary violator.

—A claim for violation of section 25504.1, which makes a person who materially assists in any violation of section 25401, with intent to deceive or defraud, jointly and severally liable for the violation. The investors also alleged claims for fraud and deceit, negligent misrepresentation, breach of fiduciary duty, and the sale of unregistered securities under federal law. Roth again demurred, and this time its demurrer was sustained without leave to amend.

We describe first the background information alleged in the complaint, and then turn to the particular misrepresentations and omissions alleged and the trial court's ruling.

A. *The background of the dispute.*

The lawsuit arises from the bridge note transaction, which closed on or around March 21, 2000. In addition to Roth, other persons and firms that played a role included (1) Shelly Singhal and Kimberley Wilson, managing directors who acted for Roth, and (2) Ignite Capital, a company with which eNucleus initially intended to contract to raise funds through the sale of bridge notes (but which was not a registered broker-dealer and therefore could not legally sell securities for eNucleus).

Prior to the bridge note offering that is the subject of this lawsuit, on January 24, 2000, eNucleus and Roth executed a "placement agent agreement" under which Roth was to raise $7 million in an offering of eNucleus convertible preferred stock (the preferred stock offering). A portion of the proceeds of the preferred stock offering was to be used to pay off the bridge notes. The placement agent agreement provided, "as a condition to Roth raising the financing," that:

—"Up to $2,000,000 of proceeds shall be used to payoff the bridge financing."

—"A minimum investment of $2-$3 million by a strategic investor acceptable to [Roth] to close simultaneously with this transaction."

The written misrepresentations alleged in the complaint are contained in the bridge note offering documents (offering documents) with which Roth "offered the [bridge notes] for sale to the [investors] . . . ." These documents were "collaboratively drafted and redrafted" by Roth (through Singhal and Wilson) and the law firms representing eNucleus and Roth, and were

distributed to the investors by Roth. Roth's "express purpose" in drafting the offering documents was that the documents be transmitted to the investors and others, who were invited to rely on the documents in determining whether to invest in the bridge notes. The offering documents included a summary of terms of the bridge notes and a "private placement memorandum" for the preferred stock offering that was to follow the bridge note offering. Specifically, the offering documents included:

—A confidential offering memorandum specifically related to the bridge notes. This memorandum (hereafter, February 8 bridge note summary) was negotiated and drafted by the lawyers representing Roth and eNucleus on or about February 8, 2000. It stated that the bridge notes "shall be subject to mandatory prepayment prior to the Maturity Date . . . out of all net proceeds, if any, received by [eNucleus] from any one or more subsequent private placements or public offerings of securities of [eNucleus]."

—A February 7, 2000 private placement memorandum (February 7 PPM) for the proposed placement of series A preferred stock that was to follow the bridge note offering. The February 7 PPM was negotiated and drafted by Singhal and the lawyers representing Roth and eNucleus, all of whom specifically intended that it be provided to, read by and relied on by the investors in evaluating the bridge notes.

—A "Securities Purchase Agreement" for the bridge notes.

—A form of promissory note to be executed by eNucleus.

B. *The alleged misrepresentations and omissions.*

The oral and written misrepresentations alleged in the complaint may be summarized as follows:

—*That the bridge notes could and would be repaid in full by eNucleus from the proceeds of the planned series A preferred stock offering.* This representation was made orally by Roth (Singhal) to several investors in telephone solicitations between February 10 and March 2, 2000. Roth told certain of the investors the preferred stock offering was already a "done deal," that early repayment of the bridge notes was "guaranteed," and that most of the preferred stock placement had already been raised and was set to close within three weeks of the bridge notes closing. Roth knew, however, that it had not yet raised or received commitments for any funds for the preferred stock offering.

—The same representation—that eNucleus would pay off the bridge notes in full from the proceeds of the preferred stock offering—was made in

writing in the February 7 PPM,[3] as well in the promissory notes signed by eNucleus on March 21, 2000, both of which were collaboratively drafted by Roth and the lawyers representing Roth and eNucleus. This representation was also made in the February 8 bridge note summary drafted by counsel for Roth. In fact, however:

—Roth was aware that the planned preferred stock offering and the prepayment of the bridge notes was subject to two contingencies or restrictions, stated in the conditions to Roth's January 24, 2000 placement agent agreement with eNucleus for the preferred stock offering, namely:

1. a strategic investor, acceptable to Roth, investing $2 to $3 million simultaneously with the preferred stock offering, and

2. that up to $2.0 million—rather than all—of the proceeds of the preferred stock offering was to be used to pay off the bridge notes.

—The contingency of finding a strategic investor, that no such strategic investor had yet been found, and the restrictions on repayment of the bridge notes, were not disclosed in any of the offering documents, and were not disclosed by Singhal in his telephonic solicitations of the investors.

—*The failure to disclose the cancellation of eNucleus's merger with SJI Corporation.* The revenue projections in the February 7 PPM were expressly based upon eNucleus's acquisition of another company (SJI Corporation) that was expected to close within 30 days after February 7, 2000. However, on March 3, 2000, eNucleus terminated the SJI merger agreement. This was 17 days before the bridge note transaction closed. The cancellation of the merger made the pro forma financial statements in the February 7 PPM "materially false and misleading prior to the closing of the Bridge Note transaction . . . ." And, because the preferred stock offering "was specifically contingent on the SJI merger closing, there would never be a preferred stock financing and hence the Bridge Notes would not be paid off . . . ." Also, the securities purchase agreements, executed by eNucleus and each of the investors as of March 1, 2000, represented that the February 7 PPM contained no misrepresentations or omissions as of that date, and that no material adverse effect had occurred since that date.

—*That the bridge notes were "senior" securities.* Singhal orally represented to certain of the investors that the bridge notes were "senior"

---

[3] The February 7 PPM for the preferred stock offering stated that eNucleus "intend[s] to pay down the outstanding bridge loan not converted to common stock with the Series A preferred stock proceeds."

securities. This representation was also made in the March 21, 2000 promissory notes drafted by Roth and the lawyers for Roth and eNucleus, which stated the bridge notes were senior in right of payment to all subsequent obligations of eNucleus. Roth was aware that the obligation to repay the bridge notes was not senior in right of payment to all subsequent eNucleus obligations.

—*That Roth was the only broker-dealer receiving a commission from eNucleus in connection with the bridge notes offering.* The securities purchase agreement represented that, except for Roth, no person, firm or corporation would be entitled to receive any fee or commission from eNucleus in connection with the bridge notes offering, and eNucleus would not make any such payment. The February 8 bridge note summary also stated Roth would receive a 10 percent commission, and did not mention any other commissions. In fact, however, Roth was "consciously aware" that Ignite Capital was to receive an undisclosed and illegal commission for successfully soliciting funds from the investors in the bridge note transaction, and "Roth was secretly compensating Ignite Capital."[4]

—*Other misrepresentations.* The complaint also alleges that:

—Singhal orally represented that eNucleus would be cash flow positive or have positive earnings at the end of the first quarter 2000; that eNucleus needed the proceeds of the bridge notes to fund its rapid expansion and growth, rather than to pay outstanding debts; and that the proceeds of the bridge notes actually would be used to fund the expansion and growth of eNucleus's business. The complaint alleges that Roth had "absolutely no basis" for the above statements, and in fact was aware that eNucleus was in "a desperate financial situation as it could not pay its outstanding bills when due . . . ."

—The "use of proceeds" section of the February 7 PPM "was false and incomplete as it omitted to state that eNucleus intended to repurchase more than $650,000 of stock" from eNucleus principals with the bridge note proceeds. The securities purchase agreements also represented that the proceeds of the bridge note offering would be used for general corporate purposes, whereas in fact the proceeds of the bridge notes "were intended to be used for purposes other than the stated purposes" in the offering documents . . . ."

---

[4] A letter of intent was signed by eNucleus on December 10, 1999, calling for Ignite Capital to raise between $1 million and $3 million through the sale of senior bridge notes and stock identical to the bridge notes ultimately sold to the investors. Later, on December 21, 1999, eNucleus and Roth signed a similar engagement letter in which Roth agreed to raise capital for eNucleus through the sale of the bridge notes.

—The February 7 PPM omitted to mention that an eNucleus principal had personally sold more than $1.2 million worth of eNucleus stock in the months leading up to the bridge note transaction, allegedly without proper registration and documentation with the SEC (Securities and Exchange Commission).

—The securities purchase agreements represented that all documents required to be filed with the SEC had been filed, and the offer and sale was exempt from registration under federal law. In fact, the federal exemption was rendered unavailable because certain investors stated they were not accredited investors, requiring eNucleus and Roth to provide them full-year financial statements, which they did not do. Other stock sales by eNucleus prior to the bridge notes offering also rendered the registration exemption invalid.

The investors alleged that Roth "acted with intent to deceive and defraud because [it] had full knowledge of the false and misleading nature of the Offering Documents" as described above, and "knowingly intended that the [investors] would read and rely on such knowingly false and misleading statements in the Offering Documents in determining to purchase" the bridge notes. Roth "also disseminated the misleading Offering Documents to the [investors] with intent to deceive and defraud."

C. *The trial court's ruling.*

On December 7, 2004, the trial court (the late Alan G. Buckner) announced its tentative decision to sustain all the demurrers without leave to amend, but, due to time constraints, set the matter for argument the following week. In the interim, Judge Buckner died, and the lawsuit was assigned to Judge Ricardo A. Torres. On January 20, 2005, Judge Torres observed that he had reviewed the transcript of the December 7 hearing at which Judge Buckner revealed his tentative ruling. After hearing argument from counsel for the investors, Judge Torres stated that he had "read the workups and demurrers, and what the judge had to look at, and you've had three chances to amend, I think you have to go to the Court of Appeal."

The investors filed timely appeals from the order sustaining the demurrers without leave to amend and dismissing the complaint. They also appealed an earlier order of the trial court, entered April 26, 2004, determining that the investors' state law claim involving the sale of unqualified securities was preempted by federal law.

## DISCUSSION

The principles governing our review of a ruling sustaining a demurrer are well established. We determine whether the complaint states facts sufficient to

constitute a cause of action and, in appropriate cases, whether there is a reasonable possibility that a defect in the complaint can be cured by amendment. We discuss first the common law causes of action for fraud, negligent misrepresentation and breach of fiduciary duty, and then turn to the statutory claims.

## I. *The common law causes of action.*

### A. *Fraud: The trial court erred in concluding the complaint did not allege the requisite intent to defraud with sufficient particularity.*

Fraud allegations must be pled with more detail than other causes of action. The facts constituting the fraud, including every element of the cause of action, must be alleged " 'factually and specifically.' " (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 216 [197 Cal.Rptr. 783, 673 P.2d 660] (*Committee on Children's TV*).) The objectives are to give the defendant notice of " 'definite charges which can be intelligently met,' " and to permit the court to determine whether, " ' "on the facts pleaded, there is any foundation, prima facie at least, for the charge of fraud." ' [Citations.]" (*Id.* at pp. 216–217.) The investors must therefore plead facts showing Roth's misrepresentation (or omission it had a duty to disclose); Roth's knowledge of falsity (scienter); its intent to defraud (i.e., to induce the investors' reliance on the misrepresentations); justifiable reliance; and resulting damage. (5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 772, p. 1121.)

We conclude that, while some of the misrepresentations alleged may not be actionable standing alone, certain of the allegations sufficiently state a fraud claim. As we explain in more detail below, these are (1) the oral representations that eNucleus already had commitments from investors to purchase all of the preferred stock offering from which the bridge notes were to be repaid, and (2) the written representations in the offering documents that eNucleus would pay off all the bridge notes from the preferred stock offering, while failing to disclose the known limitations on the preferred stock offering contained in the January 24, 2000 eNucleus/Roth placement agent agreement. As to these representations, the complaint sufficiently alleges that the representations were false and were known by Roth to be false when it participated in drafting and distributing the offering documents to the investors. The intent to induce the investors to rely on the offering documents is sufficiently alleged by Roth's distribution of the offering documents to, and express solicitation of, the investors. And, there is no serious challenge to the sufficiency of the allegations of justifiable reliance and damage. Consequently, we are bound to conclude a fraud claim is sufficiently alleged.

1. *The oral representations.*

Some of the oral misrepresentations alleged to have been made by Roth may be, viewed alone, nonactionable as opinion or prediction, such as the statement that eNucleus would be cash flow positive at the end of the first quarter 2000. Others, however, appear rather clearly to be a proper basis for a fraud claim. Prime among these is the allegation that Roth (Singhal) told several investors that the series A preferred stock offering "was already, in effect, a 'done deal' and early pre-payment [of the bridge notes was] 'guaranteed,' " and that "most of the preferred stock placement had already been raised and was set to close within three weeks of the Bridge Notes closing . . . ."

Roth argues the alleged oral representations "directly contradict the written statements in the offering documents that [the investors] alleged they received and reviewed," so that the investors could not have reasonably relied on them. Roth also points out that, in the securities purchase agreement, the investors specifically represented and warranted that "no Purchaser is relying on any oral or written representations or assurances from [eNucleus] or any other person . . . other than as set forth in this Agreement [and other specified documents]." Perhaps some of the representations do contradict the offering documents. However, the offering documents are in no way contradicted by the representations that eNucleus already had commitments for the purchase of all of the series A preferred stock offering. These statements were material representations that may have influenced the investors' decisions, because the bridge notes were to be paid off from the proceeds of the preferred stock offering. The question whether the investors actually or reasonably relied on the representations, in view of their own written representation to the contrary in the purchase agreements, is for the trier of fact.[5]

2. *The written representations.*

The written representations in the offering documents are, on their face, the representations of eNucleus, which sold the bridge notes and signed the documents. However, the investors allege Roth "collaboratively drafted and redrafted" the offering documents with counsel for eNucleus and counsel for Roth, and Roth expressly solicited the investments in the bridge notes and disseminated the offering documents to the investors, knowing of the numerous misrepresentations in them. In at least one case, the alleged misrepresentation—that the bridge notes would be repaid in full from the proceeds of the preferred stock offering—forms a sufficient basis for a fraud claim.

[5] Roth also argues that the oral representations were alleged to have been made only to certain of the investors, rather than all of them, so that some of the investors have no fraud claim. However, the complaint alleges that Singhal's representations were repeated by one investor to another. These allegations are sufficient to survive a demurrer.

The complaint alleges that Roth, along with the lawyers representing Roth and eNucleus, had previously drafted and negotiated the January 24, 2000 placement agent agreement between eNucleus and Roth that contained two conditions "to Roth raising the financing" of the preferred stock offering, namely, that "[u]p to $2,000,000 of proceeds shall be used to payoff the bridge financing," and that a "minimum investment of $2-$3 million by a strategic investor acceptable to [Roth] to close simultaneously" with the preferred stock offering. The investors claim the failure to disclose these known limitations on Roth's obligation to proceed with the preferred stock offering constituted the concealment of material facts, effectively rendering the representation that the bridge notes would be paid from the proceeds of the preferred stock offering false.

We conclude the allegations of undisclosed conditions on Roth's obligation to proceed with the preferred stock offering sufficiently state a claim of fraud based on concealment: Roth represented the bridge notes would be paid off with the proceeds of the preferred stock offering, while knowing eNucleus's obligation was to use only "[u]p to $2,000,000" to pay off the bridge notes, and while conditioning Roth's participation in the preferred stock offering on a strategic investor who would, entirely apart from the stock offering, invest $2 to $3 million—facts a bridge note investor might well wish to have known.

■ Roth resists the conclusion that a fraud claim is stated based on these omissions on two grounds, neither of which has merit. First, it contends there is a "fatal" failure "unequivocally to allege" that the conditions in the January 24, 2000 placement agent agreement "were still in effect on February 7 and 8, 2000," when the representations in the offering documents were made. If, for example, Roth waived those conditions and they were no longer in effect at the time of the February 7 and 8 offering documents, then the failure to disclose them would not be fraud. While the hypothesis may be apt, whether the facts support the hypothesis is a matter for summary judgment or trial. We think it is implicit from the complaint that the investors allege the conditions were in effect when the offering documents were distributed. " '[T]he courts should not . . . seek to absolve the defendant from liability on highly technical requirements of form in pleading. Pleading facts in ordinary and concise language is as permissible in fraud cases as in any others, and liberal construction of the pleading is as much a duty of the court in these as in other cases.' [Citation.]" (*Committee on Children's TV, supra*, 35 Cal.3d at p. 216, fn. 17.)

Roth also argues that the undisclosed conditions on Roth's obligation to go forward with the preferred stock offering "could not have had any material impact on the repayment of the Bridge Notes," because, as the complaint

alleges, Roth did go forward with the February 7 offering, as well as with a later offering renewing the preferred stock offering for the purpose of repaying the bridge notes (among other things). In other words, eNucleus's failure to raise the money to repay the bridge notes was due to the failure to attract investors in the offerings, not to Roth's refusal to participate in the offerings. We cannot see how the fact that Roth in fact went forward with the preferred stock offering has any bearing on whether or not Roth's failure to disclose the conditions was a material omission that the investors may have relied on in deciding to invest in the bridge notes.

In sum, the complaint states a claim for common law fraud based upon both oral and written representations relating to the repayment of the bridge notes from the preferred stock offering and the status of that offering. Because the complaint states an actionable fraud claim, we need not address the parties' further arguments about the sufficiency *vel non* of the other allegations upon which the investors base their cause of action for fraud.

B. *The complaint sufficiently alleges a cause of action for negligent misrepresentation.*

The elements of negligent misrepresentation are (1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage. (*Shamsian v. Atlantic Richfield Co.* (2003) 107 Cal.App.4th 967, 983 [132 Cal.Rptr.2d 635] (*Shamsian*).) In contrast to fraud, negligent misrepresentation does not require knowledge of falsity. A defendant who makes false statements " 'honestly believing that they are true, but without reasonable ground for such belief, . . . may be liable for negligent misrepresentation . . . .' [Citations.]" (*Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 407–408 [11 Cal.Rptr.2d 51, 834 P.2d 745].) However, a positive assertion is required; an omission or an implied assertion or representation is not sufficient. (*Residential Capital v. Cal-Western Reconveyance Corp.* (2003) 108 Cal.App.4th 807, 828 [134 Cal.Rptr.2d 162]; *Shamsian, supra,* 107 Cal.App.4th at p. 984; see *Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 174 [132 Cal.Rptr.2d 490, 65 P.3d 1255] (*Small*) [negligent misrepresentation "encompasses '[t]he assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true' [citation], and '[t]he positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true' [citations].")

Our conclusion that the complaint states a claim for fraud against Roth based on the affirmative oral representations discussed in part I.A.1., *ante,*

necessarily means it states a claim for negligent representation. And, while most of the written misrepresentations the investors allege are based on omissions, rather than " 'positive assertion[s] . . . of that which is not true' " (*Small, supra,* 30 Cal.4th at p. 174), one is not. The allegation that Roth misrepresented that the bridge notes would be paid off with the proceeds of the preferred stock offering is a positive assertion which, even if Roth believed it to be true, was allegedly not warranted by the information Roth had about restrictions on the preferred stock offering—i.e., a statement made without reasonable grounds for believing it to be true. Accordingly, because the complaint contains some allegations sufficient to state a negligent misrepresentation claim against Roth, the trial court erred in sustaining its demurrer to this cause of action.

> C. *The trial court correctly sustained Roth's demurrer to the claim for breach of fiduciary duty, except that investor Sedaghat should have been granted leave to amend.*

In order to plead a cause of action for breach of fiduciary duty, a plaintiff must show the existence of a fiduciary relationship, its breach, and damage caused by the breach. The investors allege Roth was placement agent for the bridge note offering; Singhal and Wilson, managing directors of Roth, "represented that they had done thorough due diligence on eNucleus and that [the investors] could trust and rely on Roth's expertise in evaluating investments such as the Bridge Notes"; and Roth was "also the stockbroker that solicited and sold" the bridge notes to the investors. The investors "thus had a confidential relationship of trust by which they looked to Wilson and Singhal for investment advice and guidance." The fiduciary duty arising from this confidential relationship is alleged to have been breached by Roth's failure to do proper due diligence on eNucleus and by its material misstatements and omissions of fact in the offering documents, resulting in the investors' purchase of worthless securities. In addition, the complaint alleges one of the investors, Shawn Sedaghat, "had an existing account with Shelly Singhal of Roth and over a period of more than one year had developed a confidential relationship with Shelly Singhal by which Mr. Sedaghat relied on, and trusted Mr. Singhal for financial advice and guidance," and Singhal "in fact told Mr. Sedaghat that he should trust and rely upon Singhal's investment expertise."

We agree with the trial court that the investors' allegations do not sufficiently allege the existence of a confidential relationship giving rise to fiduciary duties on Roth's part to the investors, with the possible exception of Sedaghat (discussed *post*). The investors do not allege facts showing either (a) the existence of a stockbroker-stock buyer relationship between Roth and them, or (b) the existence of a confidential relationship otherwise giving rise to fiduciary duties.

■ First, the conclusory allegation that Roth was "also the stockbroker that solicited and sold" the bridge notes to the investors is not a sufficient allegation of a stockbroker-stock buyer relationship that gives rise to fiduciary duties. It is a "long-settled rule" that a stockbroker owes a fiduciary duty to his or her customer. (*Brown v. California Pension Administrators & Consultants, Inc.* (1996) 45 Cal.App.4th 333, 348 [52 Cal.Rptr.2d 788].) However, in the cases so holding, "the stockbroker was an adviser to the customer about investment decisions." (*Ibid.*) Here, with the exception of Sedaghat, the complaint does not allege the investors were Roth's customers or had any other preexisting relationship with Roth. Roth was eNucleus's placement agent for the bridge note offering, not a broker purporting to act on behalf of the investors. Indeed, even when a stockbroker acts on behalf of a customer, the scope of the broker's fiduciary duty depends on the nature of the broker-customer relationship. (*Petersen v. Securities Settlement Corp.* (1991) 226 Cal.App.3d 1445, 1454 [277 Cal.Rptr. 468] [clearing broker that did not provide investment advice to its customer had no duty to warn her about the risky nature of her investments]; see *Brown v. California Pension Administrators & Consultants, Inc., supra*, 45 Cal.App.4th at p. 348 [no cause of action for breach of fiduciary duty by trustee and administrator of self-directed individual retirement accounts, where plaintiff-account owners made their own investment decisions; "[t]his was not an expansive fiduciary relationship giving rise to a duty to notify the customer of the risky nature of an investment, or . . . of the poor performance of similar investments held by different customers"].) In this case, the investors were not Roth's customers and no fiduciary relationship could arise merely from the fact Roth was a licensed broker.

Second, the investors have not otherwise alleged facts showing the existence of a confidential relationship between Roth and the investors.[6] The investors argue that when certain factors are present—a direct, consensual relationship; trust and confidence reasonably reposed by plaintiff in defendant; and management and control of plaintiff's property by the defendant—a fiduciary duty may exist, even in the absence of a traditional fiduciary relationship. But as the investors themselves observe, quoting *Vai v. Bank of*

---

[6] The investors cite *Eisenbaum v. Western Energy Resources, Inc.* (1990) 218 Cal.App.3d 314 [267 Cal.Rptr. 5] (*Eisenbaum*) for the proposition that "[a] promoter or insider, or a seller of a security owes a fiduciary duty to the prospective purchaser of such an interest." The investors misrepresent *Eisenbaum*, which actually states that "A promoter or insider, *or a seller of a limited partnership interest*, owes a fiduciary duty to the prospective purchaser of such an interest." (*Id.* at p. 322, italics added.) Roth was not, and was not alleged to be, a corporate promoter, a corporate insider, or a seller of partnership interests, all of whom may assume fiduciary duties in forming a corporation or partnership to others " ' "who may subsequently become members or subscribers . . . ." ' " (*California-Calaveras Min. Co. v. Walls* (1915) 170 Cal. 285, 296 [149 P. 595].) Roth was merely a placement agent for eNucleus's private offering.

*America* (1961) 56 Cal.2d 329, 338 [15 Cal.Rptr. 71, 364 P.2d 247], "[t]he key factor in the existence of a fiduciary relationship lies in control by a person over the property of another." That factor is completely absent in the relationship between Roth and the investors. Moreover, "[t]he mere placing of a trust in another person does not create a fiduciary relationship." (*Zumbrun v. University of Southern California* (1972) 25 Cal.App.3d 1, 13 [101 Cal.Rptr. 499].) As the court observed in *Committee on Children's TV, supra*, 35 Cal.3d at page 221, "before a person can be charged with a fiduciary obligation, he must either knowingly undertake to act on behalf and for the benefit of another, or must enter into a relationship which imposes that undertaking as a matter of law." The facts alleged in the complaint do not support either scenario.

Finally, we return to the allegation, recited above, that plaintiff Sedaghat had an existing account with Singhal and had developed a confidential relationship with him. In their opening brief, the investors recited these allegations, but did not argue that Sedaghat's position was different from that of the other investors. They do so in their reply brief, mentioning the allegations and suggesting they gave rise to a fiduciary relationship "between Roth and Plaintiffs." Clearly, no facts are alleged giving rise to a fiduciary relationship with any investor other than Sedaghat. With respect to Sedaghat, however, and reading the allegations of the complaint liberally (as we must except in the case of fraud claims), we conclude the complaint, while deficient, might be amended to state a claim. Because the claim for breach of fiduciary duty was asserted for the first time in the second amended complaint, we conclude Sedaghat should have one more opportunity to state a claim.

As noted above, the rule is long settled that a stockbroker owes a fiduciary duty to his or her customer, although the scope of the duty depends on the nature of the broker-customer relationship. The point is made in *Duffy v. Cavalier* (1989) 215 Cal.App.3d 1517 [264 Cal.Rptr. 740] (*Duffy*): "[T]he relationship between any stockbroker and his or her customer is fiduciary in nature, imposing on the former the duty to act in the highest good faith toward the customer. . . . [¶] . . . The question is not whether there is a fiduciary duty, which there is in every broker-customer relationship; rather, it is the *scope or extent* of the fiduciary obligation, which depends on the facts of the case." (*Duffy, supra*, 215 Cal.App.3d at pp. 1534–1535, citations omitted.) The "specific facts and circumstances presented in a given case" which determine the scope of the stockbroker's fiduciary duty include "the relative sophistication and experience of the customer; the customer's ability to evaluate the broker's recommendations and exercise an independent

judgment thereon; the nature of the account, whether discretionary or nondiscretionary; and the actual financial situation and needs of the customer." (*Duffy, supra,* 215 Cal.App.3d at p. 1536, fn. 10.)

Roth argues that the Sedaghat allegations do not "rise to the level of detail that is required to establish that Roth owed a 'stockbroker's' fiduciary duty to Mr. Sedaghat," because no facts are alleged as to when the account was opened, the type of account, the investment history between Singhal and Sedaghat, whether Singhal was Sedaghat's stockbroker at the time of the bridge note offering, and the scope of the relationship. We agree to this extent: the complaint is deficient in failing to allege explicitly the existence of a stockbroker-customer relationship and a brokerage account Singhal was handling for Sedaghat at the time of the bridge note transaction, as well as the nature of the account and the extent of the relationship between Sedaghat and Singhal. However, if Singhal was Sedaghat's stockbroker at that time, *Duffy* teaches us that a fiduciary obligation necessarily existed. While the extent of the fiduciary obligation will depend on the facts of the case, we think Sedaghat should have an opportunity to allege such facts, if he can.

II.  *The federal claim: The statute of limitations bars the investors' cause of action for the sale of unregistered securities under federal law.*

The investors alleged that Roth violated section 12(a)(1) of the Securities Act of 1933 (15 U.S.C. § 77a et seq.; 1933 Act) by selling securities that were not registered in accordance with federal law. (15 U.S.C. § 77*l*(a)(1).)[7] The trial court dismissed the cause of action as barred by the statute of limitations in section 13 of the 1933 Act, which provides in part: "No action shall be maintained . . . to enforce a liability created under section 12(a)(1), unless brought within one year after the violation upon which it is based. In no event shall any such action be brought to enforce a liability created under . . . section 12(a)(1) more than three years after the security was bona fide offered to the public . . . ." (15 U.S.C. § 77m.) The sale of the bridge notes occurred on March 21, 2000, and the complaint was filed more than two years later, on May 10, 2002, well beyond the bar of the one-year statute of limitations.[8]

---

[7] Section 12(a)(1) imposes strict liability for violating its registration requirements, which are the heart of the 1933 Act. The purchaser of the security can sue the seller for rescission and recovery of the purchase price. (*Sagehorn v. Engle* (2006) 141 Cal.App.4th 452, 456, 459 [46 Cal.Rptr.3d 131] (*Sagehorn*).)

[8] The second portion of section 13 of the 1933 Act is a three-year statute of repose, a "subspecies" of the statute of limitations. Statutes of repose run from a fixed date readily determinable by the defendant, rather than a date determined by the personal circumstances of the plaintiff. The two portions of section 13 "are cumulative, not alternative," so the plaintiff must bring his action within both periods. (*Sagehorn, supra,* 141 Cal.App.4th at p. 460, citing cases.)

■ The investors argue that Roth fraudulently concealed the violation of section 12(a)(1) of the 1933 Act, tolling the one-year statute of limitations. We hold, agreeing with *Sagehorn, supra,* 141 Cal.App.4th 452, that the principle of equitable tolling does not apply to a section 12(a)(1) claim.

Until *Sagehorn,* no California or federal appellate court had addressed the question whether equitable tolling applies to a 1933 Act section 12(a)(1) claim. Federal district court decisions were in conflict on the issue, with the "vast majority" finding the doctrine inapplicable. (*Sagehorn, supra,* 141 Cal.App.4th at pp. 456–457.) In a thorough and well-reasoned opinion, *Sagehorn* adopted the majority view, giving two reasons. We agree with both of them.

First, "the lynchpin of equitable tolling—the defendant's ability to conceal from a plaintiff the right to bring a lawsuit—is not present in a section 12(a)(1) action, because whether a security is registered is a matter of public record." (*Sagehorn, supra,* 141 Cal.App.4th at p. 457.) In other words, the policy concern underlying equitable tolling—that the defendant's concealment of his wrongdoing has caused the plaintiff to be unaware of his cause of action despite his reasonable diligence—is inapplicable. (*Id.* at p. 461.) A defendant who falsely represents a security is registered—or, in our case, exempt from registration—cannot " 'prevent an investor from discovering the true facts as to the lack of or requirement of its registration.' [Citation.]" (*Ibid.*)

Second, while the principle of equitable tolling generally applies to every federal cause of action, " 'it cannot apply in the face of contrary congressional intent. [Citations.]' " (*Sagehorn, supra,* 141 Cal.App.4th at p. 461.) The statutory scheme "supports the conclusion that Congress did not intend the equitable tolling doctrine to apply to a section 12(a)(1) claim." (*Ibid.*) The court explains: "Section 13 . . . specifically provides that if an action is brought alleging that a material misrepresentation or omission was made either in the registration statement or the sale itself, the statute of limitations does not begin to run until the plaintiff discovers that fraud. However, there is no language creating a discovery rule if an action is brought alleging that an unregistered security was sold. It is clear that Congress differentiated between, on the one hand, an action based on a fraud and, on the other hand, a strict liability action based upon sale of an unregistered security. If Congress had wanted to include a discovery rule for the latter, it would have done so. Its omission in that regard indicates an intent to preclude application of any discovery rule to such a claim. 'A reasonable construction of this language is that Congress intended the one year limitations period of section 12(1) claims

to be absolute.' [Citation.]" (*Sagehorn, supra,* 141 Cal.App.4th at pp. 461–462.)

*Sagehorn* provides extensive citations to the precedents on this issue, including analysis of the contrary cases and the reasons those cases are not persuasive. (*Sagehorn, supra,* 141 Cal.App.4th at pp. 461–464.) We are persuaded *Sagehorn* was correctly decided, and conclude accordingly that the investors' cause of action for violation of section 12(a)(1) of the 1933 Act is barred by the statute of limitations.

III. *Statutory causes of action under California's Corporate Securities Law.*

■ We begin with a brief outline of the Corporate Securities Law of 1968 (Act). Among other things, the Act prohibits the sale of securities in an issuer transaction unless the sale has been "qualified" in accordance with statutory requirements. (§ 25110.) The Act also includes several sections that define fraudulent and prohibited practices in the purchase and sale of securities. (§§ 25400–25404.) The relevant provision in this case is section 25401, which prohibits misrepresentations in connection with the purchase or sale of securities. Section 25401 and two other provisions that prohibit market manipulation and insider trading are "penal in nature," and violations can result in imprisonment and fines. (*California Amplifier, Inc. v. RLI Ins. Co.* (2001) 94 Cal.App.4th 102, 108–109 [113 Cal.Rptr.2d 915] (*California Amplifier*).) These three provisions have corresponding sections in the enforcement provisions of the Act (§§ 25500–25502) which establish a private remedy for damages. Under the civil liability provisions of the Act, a purchaser may recover the consideration paid for a security sold in violation of sections 25110 (the qualification provision) and 25401 (the misleading statement provision). (§§ 25501 & 25503.) The purpose of the provisions on fraudulent practices "is to create statutory liability that eliminates some of the elements of common law fraud, but balances this expansion of liability by placing other restrictions on recovery." (*California Amplifier, supra,* 94 Cal.App.4th at p. 109.) The Act also contains a provision making it illegal to knowingly provide substantial assistance to another in violation of the Act (§ 25403), but contains no corresponding provision on civil liability. Finally, as relevant to this case, the civil liability provisions of the Act provide for the joint and several liability of (1) a broker-dealer or agent who materially aids in the transaction constituting the violation (§ 25504), and (2) a person who materially assists in a violation of certain sections (including §§ 25401 & 25110) with the intent to deceive or defraud. (§ 25504.1.)

We turn first to the investors' claim that Roth violated the provisions of the Act requiring qualification of securities. (§ 25110.)

### A. The trial court erred in concluding the investors' claim under section 25110 was preempted by federal law.

■ Until 1996, both federal and state regulations governed securities offerings. In 1996, however, the National Securities Markets Improvement Act of 1996 (Pub.L. No. 104-290, § 1(a) (Oct. 1, 1996) 110 Stat. 3416; NSMIA) eliminated the dual system for certain securities offerings, and prohibited states from requiring the registration or qualification of a "covered security." (15 U.S.C. § 77r.) A "covered security" is defined to include, among other things, a security in a transaction that is exempt from registration under SEC rules or regulations. (15 U.S.C. § 77r(b)(4)(D).) Federal law exempts from registration "transactions by an issuer not involving any public offering" (15 U.S.C. § 77d(2)), and rule 506 of SEC Regulation D (Regulation D) defines the circumstances under which the private offering exemption applies.[9] (17 C.F.R. § 230.506 (2006).) In this case, the investors argue that, while eNucleus purported to issue the bridge notes under the Regulation D exemption, the bridge notes were not in fact exempt from federal registration under Regulation D, and are therefore not "covered securities."[10] Consequently, the investors' argument continues, NSMIA does not prohibit the state from requiring registration or qualification under state law.

Roth argues, on the other hand, that regardless of whether the private placement actually complied with the substantive requirements of Regulation D, the bridge notes are covered securities " 'because they were sold pursuant to those rules' " (quoting *Temple v. Gorman* (S.D.Fla. 2002) 201 F.Supp.2d 1238, 1244 (*Temple*)) and a form D (a notice of the sale of securities pursuant to Regulation D) was filed with the SEC. Roth insists that preemption is a question of law that can be decided on demurrer, and that Congress cannot have intended that its "preemption mandate" be sidestepped by "conclusory allegations" that the subject securities were not exempt. It contends *Temple,* on which the trial court relied in finding preemption, was correctly decided. We disagree, and align ourselves with the authorities which have "stated the obvious: a security has to actually be a 'covered security' before federal preemption applies." (*Hamby v. Clearwater Consulting Concepts, LLLP* (E.D.Ark. 2006) 428 F.Supp.2d 915, 921, fn. 2.)

First, while preemption "can" be decided on demurrer in a proper case, the implication that it should be decided on demurrer is erroneous. There are

---

[9] Under Regulation D, "offers and sales of securities are exempt from the registration requirements when the issuer reasonably believes there are no more than thirty-five (35) purchasers, and when each person who is not an accredited investor has the knowledge and experience in financial business matters so that he is capable of evaluating the risks." (*Lillard v. Stockton* (N.D.Okla. 2003) 267 F.Supp.2d 1081, 1114.)

[10] Only two of the investors, Apollo Capital Fund and Mernoush Mahjobi, who are separately represented, assert this claim on appeal.

numerous circumstances in which the facts must be determined in order to decide whether a claim is preempted by federal law, and it is not uncommon to have preemption claims decided based on an evidentiary showing. Indeed, preemption is an affirmative defense as to which defendants have the burden of proof. (See, e.g., *Shepard v. Edward Mackay Enterprises, Inc.* (2007) 148 Cal.App.4th 1092, 1101 [56 Cal.Rptr.3d 326] [party claiming a state law is preempted by federal legislation has the burden of demonstrating preemption; defendants met their burden of showing the transaction involved interstate commerce, so that the Federal Arbitration Act "preempt[ed] contrary state law in this case"].) Consequently, there is nothing unusual about requiring a demonstration of the bona fides of an exemption in order to determine whether preemption is appropriate.

Second, *Temple* has been roundly criticized in several recent cases, and federal appellate authority now exists rejecting its conclusion that attempting or purporting to qualify for a legitimate federal exemption results in the preemption of state law, "[r]egardless of whether the private placement actually complied with the substantive requirements of Regulation D . . . ."[11] (*Temple, supra*, 201 F.Supp.2d at p. 1244.) In *Brown v. Earthboard Sports USA, Inc.* (6th Cir. 2007) 481 F.3d 901 (*Brown*), the court held that offerings must actually qualify for a federal securities registration exemption in order to be entitled to NSMIA preemption. *Brown*, the first federal appellate court to consider the issue, reviewed the authorities and, like several federal district courts and the Supreme Court of Alabama before it, rejected *Temple*'s "broad-preemption reasoning . . . ." (*Brown*, at p. 910.) *Brown* found it was "dispositive to our inquiry that Congress chose not to include broadly preemptive language when it enacted NSMIA," instead "plainly restrict[ing] its preemptive scope to 'covered securities . . .' . . . ." (*Id.* at p. 911.) The statute "does not expressly preempt state laws with respect to non-'covered' securities, nor does the statute's text reveal an implied intent to preempt all state statutes in the field." (*Id.* at p. 912.) Moreover, "the SEC has promulgated specific requirements that must be met in order for a security to be 'covered.' " (*Id.* at p. 912.) Consequently, "NSMIA preempts state securities registration laws with respect only to those offerings that actually qualify as 'covered securities' according to the regulations that the SEC has promulgated." (*Ibid.*; see also *Buist v. Time Domain Corp.* (Ala. 2005) 926 So.2d 290, 297 [noting the absence of any citation in *Temple* to case law or other supporting authority; *Temple* "represents simply an *ipse dixit* without any accompanying analysis"]; *Grubka v. WebAccess Intern., Inc.* (D.Colo. 2006) 445 F.Supp.2d 1259, 1270 [*Temple* read language into the statute that is not there; "that a defendant could avoid liability under state law simply by

[11] Two federal district courts have followed the holding in *Temple*, but without further analysis. (*Lillard v. Stockton, supra*, 267 F.Supp.2d at pp. 1115–1116; *Pinnacle Communic. Intern. v. American Fam. Mortg.* (D.Minn. 2006) 417 F.Supp.2d 1073, 1087.)

declaiming its alleged compliance with Regulation D is an unsavory proposition and would eviscerate the statute"]; *In re Blue Flame Energy Corp.* (2006) 171 Ohio App.3d 514 [2006 Ohio 6892, 871 N.E.2d 1227, 1244] [*Temple* court supplanted the plain language of the statute with its own reading].)

■   In short, we are persuaded that the analysis and reasoning in *Brown* is correct, and we adhere to its conclusion that NSMIA preempts state securities registration requirements only with respect to securities that actually qualify as "covered securities" under federal law. (*Brown, supra,* 481 F.3d at p. 912.) The investors alleged the securities were not exempt from qualification under California law, and whether or not they were exempt presents factual questions. The trial court therefore erred in sustaining the demurrer to the investors' claim alleging the sale of securities in violation of state qualification requirements.[12]

    B.   *The trial court correctly concluded that Roth is not liable under section 25401 as a seller of the securities.*

■   Section 25401 makes it unlawful "for any person to offer or sell a security in this state" by means of untrue statements or omissions of material fact. Section 25501 provides that any person who violates section 25401 "shall be liable to the person *who purchases a security from him . . . ,* who

---

[12] Roth asserts that even if the investors' claim for the sale of unqualified securities under California law was not preempted, the trial court's dismissal of the claim would be harmless error because the claim is barred by the two-year statute of limitations in section 25507, subdivision (a). The trial court denied a motion for summary adjudication of this issue (brought by a defendant which is no longer a party to this appeal). The court ruled there was a triable issue of material fact as to whether the sale of the bridge notes should be integrated with later related offers and sales of other securities, and the issue of integration was material because, as the court read the law, the integration doctrine saves a claim that would otherwise be barred by section 25507, subdivision (a). Roth contends we may and should review the trial court's denial of the summary adjudication motion, because the "doctrine of reversal only for prejudicial error" empowers an appellate court to review any nonappealable intermediate ruling, including issues raised by the respondent. (See Code Civ. Proc., § 906 ["respondent . . . may, without appealing from [the] judgment, request the reviewing court to and it may review any of the foregoing matters [intermediate rulings involving merits or necessarily affecting the judgment appealed from] for the purpose of determining whether or not the appellant was prejudiced by the error or errors upon which he relies for reversal . . . of the judgment from which the appeal is taken"].) While Code of Civil Procedure section 906 allows a respondent " 'to assert a legal theory which may result in affirmance of the judgment' " (*Estate of Powell* (2000) 83 Cal.App.4th 1434, 1439 [100 Cal.Rptr.2d 501]), our resolution of other issues means the judgment will in any event be reversed, not affirmed. Consequently, the principle of reversal only for prejudicial error does not apply, and we will not consider the propriety of the trial court's denial of summary adjudication. (See *ibid.* [§ 906 provides a limited exception to the general rule that a respondent who has not appealed from the judgment may not urge error on appeal].)

may sue either for rescission or for damages . . . ." (§ 25501, italics added.) Section 25501 on its face requires privity between the plaintiff and the defendant. The investors purchased their securities from eNucleus, not from Roth, which acted as eNucleus's placement agent. Consequently, Roth cannot be civilly liable for a violation of section 25401. (*California Amplifier, supra,* 94 Cal.App.4th at p. 109 [§ 25501 "retain[s] the privity requirement from common law fraud"]; *Admiralty Fund v. Jones* (9th Cir. 1982) 677 F.2d 1289, 1296 [under § 25501, "liability was limited to actual sellers" and seller's attorney "was not the literal seller, as required by this section"]; cf. *Scognamillo v. Credit Suisse First Boston LLC* (N.D.Cal., Aug. 25, 2005, No. C03-2061) 2005 U.S.Dist. Lexis 20221, pp. *27–*28 (*Scognamillo*) ["[u]nlike sections 25401 and 25501, sections 25400 and 25500 do not require direct privity—i.e., a sale from defendant to plaintiff"].)

The investors seek to avoid this conclusion by arguing that section 25401 was derived from the analogous federal statute (§ 12(a)(2) of the 1933 Act), so that "the definition of a 'seller' under § 25401 is analogous to a 'seller' under § 12 of the '33 Act." The investors point out that section 12 has been construed by federal courts to "include in the statutory seller status at least some persons who urged the buyer to purchase." (*Pinter v. Dahl* (1988) 486 U.S. 622, 644, 647 [100 L.Ed.2d 658, 108 S.Ct. 2063] (*Pinter*) [statutory seller status extends "to the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner"].) While "federal decisions interpreting substantially identical statutes are unusually strong persuasive precedent on construction of our own laws" (*Kamen v. Lindly* (2001) 94 Cal.App.4th 197, 203 [114 Cal.Rptr.2d 127]), the investors' argument runs aground because California's statute, while modeled on federal law, is not, on the matter of statutory seller status, "substantially identical" to federal law.

The federal statutes impose liability only on a "seller," without expressly addressing the liability of participants. California law, by contrast, defines the liability of various participants in a transaction in separate sections of the statute. For example, section 25504 imposes liability on a broker-dealer or agent who materially aids in the act or transaction, and section 25504.1 imposes liability on any person who materially assists in a violation with intent to deceive or defraud. Consequently, federal and state laws in this regard are not "substantially identical," and no need exists to widen liability to persons other than the seller by an expansive interpretation of section 25501. As Marsh & Volk's treatise observes, "no occasion or justification exists for a court to impose liability based on [a participation] theory on anyone other than the actual vendor of that security under Corp. Code §§ 25401 and 25501 . . . because Corp. Code §§ 25504, 25504.1, and 25504.2 precisely set forth the extent to which persons other than the vendor

may also be liable."[13] (1 Marsh & Volk, Practice Under the Cal. Securities Laws (rev. ed. 2006) § 14.03[4][b], p. 14-23 (rel. 32-6/04), fns. omitted (Marsh & Volk); see *Kamen v. Lindly, supra,* 94 Cal.App.4th at p. 203, fn. 2 ["courts afford great deference to [the Marsh & Volk] treatise when interpreting California securities law," because Marsh was the reporter for the committee that drafted the law and Volk was the Commissioner of Corporations at the time].)

The investors insist that liability under section 25401 attaches to one who actively solicits the sale of the securities with a motive of benefiting himself financially, just as it does under federal law. But the only California authority it cites for this proposition is *Insurance Underwriters Clearing House, Inc. v. Natomas Co.* (1986) 184 Cal.App.3d 1520, 1526 [228 Cal.Rptr. 449], a case in which plaintiffs sued the seller and numerous other defendants, including underwriters. The court affirmed the trial court's order sustaining all demurrers, because the omissions alleged were not material or misleading as a matter of law. The court merely observed that the test of materiality under the Corporations Code was the same as under federal law. (*Ibid.*) In short, the case does not even purport to address the issue of seller liability under section 25401. The federal district court cases the investors cite are likewise unpersuasive, as at most they indicate without discussion that the test for seller liability is the same under California and federal law. (E.g., *Wanetick v. Mel's of Modesto, Inc.* (N.D.Cal. 1992) 811 F.Supp. 1402, 1406 [stating that to incur liability as a seller under federal law and under sections 25110, 25401 and 25402 of the Act, an individual must successfully solicit the purchase, motivated at least in part by a desire to serve his own financial interests, citing *Pinter, supra,* 486 U.S. 622; defendants did not themselves offer or sell securities within the meaning of *Pinter*].)

In sum, we are persuaded by the authorities and by the structure of the California statute that the trial court correctly concluded that liability under section 25501 attaches only to the actual seller of the securities, who, if he violates section 25401, "shall be liable to the person who purchases a security from him . . . ." (§ 25501.)

---

[13] See also section 25510, part of the Act, which provides that: "Except as explicitly provided in this chapter, no civil liability in favor of any private party shall arise against any person by implication from or as a result of the violation of any provision of this law or any rule or order hereunder. . . ." Marsh & Volk observe that the purpose of this provision "is to prevent the courts from using other provisions of the statute to create implied causes of action . . . which may be inconsistent with the expressed legislative intention regarding the conduct necessary to render a defendant liable or the qualifications necessary to permit a plaintiff to recover." (1 Marsh & Volk, *supra,* § 14.02[1], p. 14-15.)

C. *The trial court correctly concluded no private right of action exists under section 25403.*

▮ Under section 25403, a person who knowingly provides substantial assistance to another person in violation of any provision of the corporate securities law is deemed to be in violation of that provision, to the same extent as the person to whom assistance was provided. (§ 25403, subd. (b).) However, the civil liability provisions of the statute (§§ 25500–25510) do not expressly provide a private right of action for a violation of section 25403, as they do for other specified provisions of the Act. Consequently, the trial court properly sustained the demurrer to this cause of action. (*Scognamillo, supra,* 2005 U.S.Dist. Lexis 20221 at pp. *28–*29 [private remedies for violation of code provisions in the 25400 series, which are penal in nature, exist only by virtue of corresponding provisions in the 25500 series; plaintiffs failed to identify any such corresponding statute for violation of section 25403].) Moreover, the investors' opening briefs contain no argument challenging the trial court's ruling on section 25403, so that any claim of error with respect to the ruling has been waived. (*Dieckmeyer v. Redevelopment Agency of Huntington Beach* (2005) 127 Cal.App.4th 248, 260 [24 Cal.Rptr.3d 895].)

D. *Section 25504: The complaint alleges facts supporting Roth's liability for materially assisting eNucleus in selling the securities by means of untrue or misleading statements in the offering documents.*

▮ Section 25504 of the Act provides that every broker-dealer or agent who materially aids in an act or transaction for which liability is imposed under section 25501 is liable jointly and severally with and to the same extent as the person liable under section 25501 (which creates civil liability for § 25401 violations). Section 25501 imposes liability not only for statements known to be false or misleading, but also for those made without exercising reasonable care to determine the truth or falsity of the statement. (1 Marsh & Volk, *supra,* § 14.03[3][a], p. 14-20.) The "act or transaction constituting the violation" (§ 25504) of section 25401 is eNucleus's sale of the bridge notes "by means of any written . . . communication" which includes an untrue or misleading statement. (§ 25401.) The trial court sustained Roth's demurrer to this claim, observing that the facts alleged did not support the argument that Roth materially aided in the drafting of the offering documents. We conclude the trial court erred in sustaining Roth's demurrer to this cause of action.

The investors point out section 25504 does not require that Roth actually draft the offering documents, but only that it "materially aid[ed]" in the bridge note offering. That is, by serving as eNucleus's placement agent and broker-dealer for the bridge note offering and actively soliciting the investors'

purchases, "Roth 'material[ly] aided' in the Bridge Note transaction." While the investors' argument is phrased too broadly, we agree with it in part. To be jointly and severally liable under section 25504, Roth must have materially aided, not simply in the transaction, but in the violation—that is, in eNucleus's sales of the bridge notes by means of false or misleading statements in the offering documents. Merely "play[ing] an active role in the Bridge Note offering" does not suffice.[14] But neither is it necessary, as the trial court apparently thought, to show Roth's actual participation in drafting the false or misleading statements by means of which the bridge notes were sold (although the complaint in any event alleges this is so). To plead that Roth materially aided eNucleus in the latter's sales of the bridge notes by false or misleading representations, the investors were required to plead facts showing Roth's knowledge of the false or misleading nature of the representations in the offering documents (or that Roth knew facts giving it reasonable grounds to know the statements were false or misleading).[15] (1 Marsh & Volk, *supra*, § 14.03[4][c], p. 14-25.) We conclude they did so.

Roth argues that the investors did not properly plead essential facts showing that the representations attributed to Roth were untrue, or that Roth had actual knowledge of the false or misleading nature of the representations (or reasonable grounds to believe the statements were false or misleading), or that the representations were anything more than "puffery" and nonactionable opinion. While Roth may be correct with respect to some of the representations alleged, the point is necessarily controlled by our conclusion that the allegations of undisclosed conditions on Roth's obligation to participate in the preferred stock offering sufficiently states a claim of common law fraud based on concealment. Roth solicited the purchase of the bridge notes with offering documents that represented the bridge notes would be paid off with the proceeds of the preferred stock offering, while knowing eNucleus's obligation was to use only "[u]p to $2,000,000" to pay off the bridge notes, and while conditioning Roth's participation in the preferred stock offering on obtaining a strategic investor who would separately invest $2 to $3 million. In short, because the complaint sufficiently alleges a fraud claim against Roth, it is necessarily sufficient to allege a claim that Roth materially aided eNucleus in the sale of the bridge notes by means of false or misleading statements within the ambit of section 25504. (See *California Amplifier, supra*, 94 Cal.App.4th at p. 109 [fraudulent practices provisions create statutory liability that eliminates some of the elements of common law fraud].)

[14] Were it otherwise, a section 25504 violation would be a strict liability offense in which a broker-dealer would be liable for a seller's false or misleading statements regardless of the state of the broker-dealer's knowledge.

[15] Recovery in a civil action for a section 25401 violation is permitted "*only* if the seller was aware or was negligent in failing to be aware that his representations were misleading." (*People v. Simon* (1995) 9 Cal.4th 493, 516 [37 Cal.Rptr.2d 278, 886 P.2d 1271].)

### E. *The complaint sufficiently alleges a violation of section 25504.1.*

Section 25504.1 of the Act provides that any person who "materially assists" in a violation of section 25401, "with intent to deceive or defraud, is jointly and severally liable with any other person liable" for the violation. In California, the Supreme Court has repeatedly indicated that "intent to defraud" is the intent "to induce reliance" on the knowing misrepresentation or omission. (E.g., *Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638 [49 Cal.Rptr.2d 377, 909 P.2d 981].) Thus, to the extent the complaint alleges facts to show Roth materially assisted eNucleus in selling the bridge notes by false or misleading statements, and intended to induce the investors to rely on representations known to be false or misleading, the complaint properly alleges a claim for liability under section 25504.1. (See *In re ZZZZ Best Securities Litigation* (C.D.Cal., Jul. 23, 1990, No. CV87-3574) 1990 U.S.Dist. Lexis 11867, pp. *51–*52 [allegation that defendant law firm acted with the statutorily required intent to deceive or defraud, when read in conjunction with allegations of actual knowledge, properly alleges secondary liability under § 25504.1].) Again, because we have concluded the complaint sufficiently states a claim of fraud based on certain of the misrepresentations alleged—in particular, the representations that the bridge notes would be paid off with the proceeds of the preferred stock offering—it necessarily states a claim to the same extent for liability under section 25504.1.[16]

### DISPOSITION

The judgment of dismissal is reversed and the cause is remanded to the trial court with directions (A) to vacate its order of April 26, 2004, to the extent the order determined that the investors' claim for the sale of unqualified securities under Corporations Code section 25110 was preempted by federal law; and (B) to vacate its order sustaining all demurrers to the third amended complaint without leave to amend and to enter a new order (1) sustaining without leave to amend Roth's demurrers to the first, second, and seventh causes of action for violations of Corporations Code section 25401, Corporations Code section 25403, and section 12(a)(1) of the Securities Act of 1933; (2) overruling Roth's demurrers to the third, fourth, fifth and sixth causes of action for violation of Corporations Code section 25504, for violation of Corporations

---

[16] The investors also argue the facts alleged in the complaint state a cause of action under the Act's provisions prohibiting market manipulation (§§ 25400 & 25500), a cause of action the investors did not allege in the complaint and did not argue before the trial court. In view of our conclusion that other claims under the Act are properly stated, and counsel's observation during oral argument that a claim under sections 25400 and 25500 would be unnecessary if the investors may proceed on other statutory claims, we need not discuss whether the investors should be permitted to amend their complaint to allege a claim under sections 25400 and 25500.

Code section 25504.1, for fraud and deceit, and for negligent misrepresentation; and (3) sustaining Roth's demurrer to the eighth cause of action for breach of fiduciary duty, with leave to amend only with respect to the claim of plaintiff Shawn Sedaghat. The appellants are to recover their costs on appeal.

Cooper, P. J., and Flier, J., concurred.