[No. B227421. Second Dist., Div. Seven. July 20, 2011.]

GLENN M. MOSS, JR., Plaintiff and Appellant, v.
ROBERT KRONER et al., Defendants and Respondents.

## COUNSEL

Law Office of John E. Trommald, John E. Trommald; and Leslie S. Akins for Plaintiff and Appellant.

No appearance for Defendants and Respondents.

## OPINION

ZELON, J.—Glenn M. Moss, Jr., appeals the dismissal of his action against Robert Kroner and Robert E. Kroner Insurance Services, Inc.[1] (collectively, the Kroner defendants), after they successfully demurred to his fourth amended complaint and the trial court denied leave to amend. We reverse the judgment, conclude that Moss stated two viable causes of action under the Corporations Code, and remand the matter to the trial court.

### FACTUAL AND PROCEDURAL BACKGROUND

For the purposes of reviewing a dismissal after a sustained demurrer, we take all pleaded facts in the complaint as true. (*Cobb v. O'Connell* (2005) 134 Cal.App.4th 91, 95 [36 Cal.Rptr.3d 170].) In his fourth amended complaint, Moss alleged that as a result of the solicitations of the Kroner defendants and others, he invested $1 million in a Diversified Lending Group, Inc. (DLG), secured investment note. DLG later was shut down by the Securities and Exchange Commission for running a Ponzi scheme.

Moss did not sue DLG due to a federal court stay preventing it and its president, Bruce Friedman, from being named in lawsuits; nor is he currently suing the person who actually sold him the note, Scott Plamondon, with whom he has previously settled his claims. Instead, he sued the Kroner

---

[1] At Moss's request, on March 28, 2011, the appeal was dismissed as to Milton Belfer, Milton L. Belfer Insurance Services, Inc., The MB Group, and the Corporate Planning Group.

defendants, who are alleged to have, inter alia, acted as the middle step in Moss's purchase of the note. Robert Kroner and Milton Belfer, both insurance agents, were allegedly principals of the Corporate Planning Group (CPG). In most instances in the fourth amended complaint, Moss treated Kroner and Belfer, their respective insurance companies, and CPG as one entity, which he called "the Belfer/Kroner Defendants."

Moss alleged that CPG and DLG entered into a "strategic alliance" and joint marketing agreement by which CPG would promote DLG investment products and become the gatekeeper of transactions and client/advisor relationships with DLG. As Belfer wrote to DLG's president, "[A]ny business written must go thru [sic] Kroner and me. We are controlling the activity so that your program is properly promoted . . . ." CPG redesigned an investment program for DLG, prepared marketing materials for that program, and then disseminated the materials and discussed DLG, its president, and DLG notes at a "rollout" meeting for that program. Plamondon attended the rollout meeting and later presented to Moss the information he received there from Belfer, Kroner, and CPG. This information included six representations that Moss has claimed to have been false:

—DLG notes had zero risk;

—DLG notes offered guaranteed returns of 9 percent or 12 percent, depending on the program;

—DLG had never missed a payment to an investor;

—DLG invested only in "Income Stream Properties";

—DLG had been operating for more than 23 years; and

—DLG had more than $550 million in assets under management.

Plamondon conveyed these representations to Moss on May 29, 2008, in the course of pitching the DLG investment. These representations, Moss alleged, were material to his decision to invest in DLG.

Moss asserted that the Kroner defendants acted as gatekeepers for investments in DLG. They marketed DLG investment products and made arrangements with entities such as Plamondon's alleged employer, Highland Insurance, by which Highland agents would encourage investments in DLG, collect

applications and funds for those investments, and transmit them to Belfer and Kroner, who would in turn forward those materials to DLG. Belfer and Kroner would then share the commissions they received from DLG with the selling agents.

Kroner and Belfer, Moss claimed, knew or should have known long before Moss invested that something was wrong with DLG investments. The first sign of a problem, according to Moss, was a 2007 communication from NFP Securities to, inter alia, Belfer, in which NFP stated that the DLG notes and secured real estate fund, either alone or in conjunction with the secured premium financing program, were securities. In March 2007 Belfer allegedly produced a letter to NFP from an attorney stating that the notes were not securities,[2] but NFP found this letter inadequate and declined further involvement in DLG. Later, in April 2008, DLG informed the Belfer and Kroner defendants that it was being investigated for selling unregistered securities; it had retained legal counsel who advised DLG to stop selling the notes because they were securities; it would most likely be required to rescind the sale of its notes; and that DLG would close down its investment notes program in order for DLG to prepare the necessary documents for the Securities and Exchange Commission.

Moss alleged that instead of discontinuing the investment scheme based on this information, Kroner urged Plamondon to sell with more urgency: "Kroner contacted Plamondon and told him that DLG was going to be closing down its DLG Notes program for a number of months in order for DLG and [its president] to 'register' the DLG Notes, and encouraged Plamondon to sell more DLG Notes to his clients before the offering closed." Kroner continued to process DLG investor applications from Plamondon.

At the end of April 2008, Belfer and Kroner received an e-mail from another company reiterating the view that DLG notes were securities and warning them that selling those notes could constitute the illegal sale of an unregistered security. This message contained an eight-page attachment describing 38 items of concern about DLG, its marketing materials, and inconsistencies that had been identified by the company's securities counsel. By early May 2008, Moss alleged, the Kroner defendants were aware of the following facts:

—"that the DLG 9% Reinsured Notes were not fully insured and that only 10% of an investor['s] DLG investment was secured";

---

[2] The fourth amended complaint actually stated that the letter said that the notes were not "investments," but based on the context of the allegations we believe that the word meant was "securities."

—"that there were issues with DLG's financial records and reports, and that DLG's claims of property ownership and value were not supported";

—that DLG's president's "background was an issue"; and

—that the DLG notes were securities and that they would need a securities license to participate in their sale.

On May 23, 2008, DLG's president wrote an e-mail stating that no more DLG notes could be sold. Moss alleged that this e-mail was "relayed" to Belfer.

On May 29, 2008, Plamondon and Moss met to discuss DLG. Using the information and written materials he had obtained from the Belfer and Kroner defendants, Plamondon told Moss that DLG was a real-estate-based investment and that the investment notes offered by DLG were the best investment Plamondon had had the opportunity to sell in years. Plamondon told Moss that DLG's president bought distressed income-producing properties from institutional owners, improved them, and then rented them, holding them in DLG's portfolio. Investor funds were used to acquire the properties and make real-estate-related loans. Plamondon told Moss that he could participate in an investment program that paid 12 percent interest and was secured by DLG's real estate portfolio worth in excess of $2 billion. Plamondon also told Moss that the value of DLG's real estate was far greater than its obligations to investors, and that because of the program's conservative nature and the value of the properties, the notes were "safe, 'zero risk,' and secure."

Moss alleged that the representations made by Plamondon, based on information he received from the Kroner defendants, were false and were material to his investment decisions. Moss, an inexperienced investor whose inheritance was his retirement nest egg, relied on Plamondon and the information he received from him regarding the proposed investment. Moss had advised Plamondon he would consider only investments that were "secure, conservative, and posed minimal to no risk of loss to his monies."

In reliance on the representations about DLG and its investments, Moss agreed to invest $1 million with DLG for a five-year term at a guaranteed annual rate of return of 12 percent. Plamondon filled out the DLG investor application with Moss, as well as an authorization for the release of information that specified Belfer, Kroner, and CPG as authorized recipients of information about the DLG investment. Moss questioned Plamondon about the release, and Plamondon told Moss that "regarding the DLG investments, he worked with Belfer, Kroner and CPG as a team."

Plamondon collected the funds for the investment and the paperwork, and then transmitted them to the Belfer and Kroner defendants. Moss alleged that the Belfer and Kroner defendants transmitted those items to DLG with a cover letter written by Belfer on CPG letterhead. According to Moss, the completed application "identifies BELFER/KRONER as receiving" it. The sale of the DLG note to Moss occurred on May 30, 2008. The Belfer/Kroner defendants received approximately $30,000 from the sale of the note to Moss.

Moss alleged that with respect to the solicitation, offer, sale and administration of Moss's DLG investment, the Kroner defendants were acting as dual agents of DLG and of Moss. Conduct subsequent to the sale evidenced that agency status, according to Moss: On account statements pertaining to Moss's investment, DLG listed Belfer as the agent. When DLG's president disclosed to investors in December 2008 that he was a convicted felon who had previously filed for personal bankruptcy and who had been charged with mail fraud, Kroner wrote to Moss as a CPG client concerning the investment. Kroner also telephonically reassured Moss of the safety of the investment and claimed that "he [Kroner] would be the last person to take his money out of DLG as he would make sure that all of his clients got their money out of DLG first."

Moss asked repeatedly for his money to be returned, but DLG never returned or refunded any of Moss's investment. Although the Securities and Exchange Commission has sued DLG and others, resulting in the appointment of a receiver who has filed suits in an attempt to recover DLG assets, there have been no distributions by the receiver to DLG investors.

Moss sued, inter alia, the Belfer and Kroner defendants. In his fourth amended complaint, Moss's causes of action against the Kroner defendants included violations of Corporations Code[3] sections 25110 and 25401.

In his first cause of action, Moss contended that the note he bought constituted a security under California law and that DLG violated section 25110 by selling him a security that was neither qualified nor exempt from qualification requirements under the Corporations Code. Moss further alleged that the Kroner defendants materially aided in the sale of the DLG note to him and shared in the intent to defraud him, and therefore under sections 25504 and 25504.1 were jointly and severally liable with DLG for the violation of section 25110. Moss alleged that although the Kroner defendants

---

[3] Unless otherwise indicated, all further statutory references are to the Corporations Code.

had been advised that the notes were securities and were not qualified for sale, they proceeded nonetheless to sell the notes—including the sale to Moss, which resulted in a commission of approximately $30,000 to the Kroner defendants and others involved in the sale.

In Moss's second cause of action, he contended that the Kroner defendants, among others, had sold a security to him by means of written and oral communications including an untrue statement of material fact or omitting a material fact necessary to make the statement not misleading. (§ 25401.) The Kroner defendants were alleged to have materially aided in the sale of the DLG note; to have received the DLG application and check for $1 million from Plamondon, who had received them from Moss; and then, "as sales persons for DLG and 'Agent,' " to have forwarded the items to DLG. The Kroner defendants were also alleged to have created, along with others, the marketing materials that were used to sell the security to Moss. Moss asserted that the Kroner defendants materially aided in the sale of the DLG note to him and shared in the intent to defraud him, and therefore under sections 25504 and 25504.1 were jointly and severally liable with DLG for DLG's violation of section 25401.

The Kroner defendants demurred, and the trial court sustained the demurrers without leave to amend. The trial court dismissed the action as to the Kroner defendants, and Moss appeals with respect to the first two causes of action only.

## DISCUSSION

### I. Standard of Review

" 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff. [Citation.]" (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

## II. *First Cause of Action*

■ The trial court sustained the demurrer to the first cause of action for violation of section 25110 because the Corporations "Code refers to a 'control' person and these defendants are not control persons nor are the[y] alleged to be such persons anywhere in the" fourth amended complaint. Section 25110 provides that it is unlawful to sell unregistered securities in an issuer transaction except under specific circumstances. Section 25503 provides that any person who violates section 25110 "shall be liable to any person acquiring from him the security sold in violation of such section," establishing civil liability for the actual seller of the illegally sold security.

■ The trial court erred in concluding that the first cause of action failed because the defendants were not alleged to be control persons, because California law provides for numerous other actors to be held secondarily liable for the illegal sale of a security in violation of section 25110. Section 25504, on which Moss relies, provides that every agent who materially aids in the act or transaction constituting the violation is jointly and severally liable with the actual seller. An agent is defined by statute as "any individual, other than a broker-dealer or a partner of a licensed broker-dealer, who represents a broker-dealer or who for compensation represents an issuer in effecting or attempting to effect purchases or sales of securities in this state." (§ 25003, subd. (a).) With his allegations about the working relationship between the Kroner defendants, CPG, and DLG by which the Kroner defendants promoted, marketed, and participated in the sales of DLG investment products for a commission from DLG, Moss adequately alleged in the fourth amended complaint that the Kroner defendants promoted and represented DLG in effecting or attempting to effect sales of securities in California, and that they materially aided in the transaction that violated section 25110. Accordingly, Moss stated a viable claim for a violation of section 25110 by means of section 25504 and the first demurrer to the first cause of action should not have been sustained.[4]

---

[4] The trial court's ruling on the demurrers is somewhat unclear in that after its discussion of the first cause of action described above, but before the discussion of the second cause of action, the court included a paragraph concerning finders and middlemen that concluded with sentences concerning duties of brokers and agents and specific facts regarding a special relationship between plaintiff and defendants. To the extent that the court included this discussion with the intent that it apply to the analysis of the first cause of action, the court's statements would appear to implicitly conclude that the Kroner defendants cannot be considered agents or brokers based on the allegations of the fourth amended complaint. The court's definition of agency, in this paragraph, however, appears to derive from case law concerning finders or middlemen in real estate transactions, as it is significant to the court that there was no allegation that defendants negotiated the price or terms of the negotiation. While such a distinction may be relevant to the determination of whether a participant in a real estate transaction acted as a finder or a broker (*Sullivan v. Hopkins* (9th Cir. 1970) 435 F.2d 1128,

■ Section 25504.1 also furnishes a basis for liability here independent of whether the Kroner defendants may be labeled agents within the meaning of section 25504. Section 25504.1 provides that any person who materially assists in a violation of section 25110 with the intent to deceive or defraud is jointly and severally liable with any other person who is liable for an illegal sale of unregistered securities under section 25110. Intent to defraud is defined as the intent to induce reliance on a knowing misrepresentation or omission. (*Apollo Capital Fund LLC v. Roth Capital Partners, LLC* (2007) 158 Cal.App.4th 226, 257 [70 Cal.Rptr.3d 199] (*Apollo*).) Therefore, to the extent that the fourth amended complaint alleges that the Kroner defendants materially assisted DLG in selling unregistered securities and that they possessed the intent to defraud or deceive, the complaint properly alleges a claim for liability under section 25504.1. Here, Moss's allegations add up to a claim that perhaps as early as 2007 and certainly by April of 2008, the Kroner defendants were aware that investments in DLG were illegal securities—and, as of April 2008, they knew that the notes program was likely subject to an immediate shutdown. Based on this information, Kroner contacted Plamondon and urged him to sell as many of these unregistered securities as possible before sales were discontinued due to noncompliance with registration requirements. As of the time of Moss's investment, he has alleged, the Kroner defendants knew not only that they were unregistered securities but also that the investment was not a risk-free proposition with a guaranteed return; that the DLG 9 percent reinsured notes were not fully insured and that only 10 percent of an investor's DLG investment was secured; that there were issues with DLG's financial records and reports, and that DLG's claims of property ownership and value were not supported; and that DLG's president's "background was an issue"; but they continued to play their part in the sales transactions, including Moss's. These allegations are sufficient to state a claim that the Kroner defendants materially assisted in the sale of unregistered securities in violation of section 25110 with the intent to deceive or defraud.

## III. *Second Cause of Action*

Moss's second cause of action, also for a securities violation, alleged a violation of section 25401 by means of sections 25504 and 25504.1. Section 25401 makes it illegal to "offer or sell a security in this state or buy or offer

---

1131), it does not appear to be relevant to agency as it is defined in section 25003 for the purposes of the Corporate Securities Law of 1968 (§ 25000 et seq.). Whether a person acted as a finder or a broker, moreover, is a question of fact (*Preach v. Monter Rainbow* (1993) 12 Cal.App.4th 1441, 1452 [16 Cal.Rptr.2d 320]), and because Moss's allegations were sufficient to state a claim that the Kroner defendants were acting as DLG's agents within the meaning of sections 25003 and 25504, the agency question cannot properly be resolved on demurrer.

to buy a security in this state by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

Section 25501 establishes civil liability for a violation of section 25401: "Any person who violates Section 25401 shall be liable to the person who purchases a security from him or sells a security to him, who may sue either for rescission or for damages (if the plaintiff or the defendant, as the case may be, no longer owns the security), unless the defendant proves that the plaintiff knew the facts concerning the untruth or omission or that the defendant exercised reasonable care and did not know (or if he had exercised reasonable care would not have known) of the untruth or omission."

In addition to the primary or direct civil liability established in section 25501, the Legislature has expressly extended liability for a violation of section 25401 to specified secondary actors by means of the same secondary liability statutes discussed above with reference to the first cause of action. Sections 25504 and 25504.1 establish joint and several liability on the part of certain actors, including agents who materially aid in the transaction constituting the violation (§ 25504) and persons who materially assist in the violation with the intent to deceive or defraud (§ 25504.1). (*Apollo, supra,* 158 Cal.App.4th at p. 253.) The two statutes contain slightly different language describing that liability: section 25504 makes its secondarily liable actors "liable jointly and severally with and to the same extent as" the primary actor; section 25504.1 simply makes them "jointly and severally liable" with the primary violator.

Here, the trial court sustained the demurrer to the second cause of action, finding section 25401 "inapplicable because it is clear from the [fourth amended complaint] and the previous pleadings that plaintiff bought his securities from DLG and not demurring defendants." We conclude that Moss has sufficiently alleged a claim for violation of section 25401 by means of sections 25504 and 25504.1.

## A. *Privity for Purposes of Liability*

*SEC v. Seaboard Corp.* (9th Cir. 1982) 677 F.2d 1289 (*Seaboard*),[5] on which the trial court relied to support its implicit conclusion that there can be no liability against anyone other than a direct seller for a violation of section

---

[5] This decision is also referred to as *Admiralty Fund v. Jones.*

25401, does not, upon a closer reading, so hold. The *Seaboard* court observed that a corporation's attorney could not be held liable for an illegal stock sale under sections 25401 and 25501 because he was not the direct seller of the stock. (*Seaboard*, at p. 1296.) The court of appeals did not, however, make any ruling purporting to bar joint and several liability under section 25504 or 25504.1 whenever the defendant was not the direct seller of the security. To the contrary, the court of appeals noted the then recently enacted section 25504.1 did in fact provide for liability for any person who materially assisted in a violation of section 25401, but explained that section 25504.1 could not be applied because it was not yet in force at the time of the securities sale in question. (*Seaboard*, at p. 1296, fn. 7.) The court of appeals did not mention section 25504 in *Seaboard*. We suspect that this was because the appealing party was the attorney for a corporation and was not among the secondary actors, such as a control person, director, partner, or principal executive officer of a liable firm or corporation, an employee of a liable person, or a broker-dealer or agent, who could be held jointly and severally liable for a violation of section 25401 by means of section 25504.

■ Although *Seaboard* has regularly been cited as the source of a rule that strict privity is required for any suit resting on an underlying violation of section 25401, even if the liability is based on section 25504 or 25504.1 (see, e.g., *In re Diasonics Securities Litigation* (N.D.Cal. 1984) 599 F.Supp. 447, 459 [§ 25504]; *Lubin v. Sybedon* (S.D.Cal. 1988) 688 F.Supp. 1425, 1453 [§§ 25504, 25504.1]), interpreting *Seaboard* in this manner not only ignores its express recognition of liability-expanding section 25504.1 but also has the effect of reading sections 25504 and 25504.1 out of existence. Numerous courts have recognized that strict privity is required only for claims of primary liability under sections 25401 and 25501, and not for secondary liability suits alleging joint and several liability for a violation of section 25401 by means of sections 25504 and/or 25504.1. (See *Bains v. Moores* (2009) 172 Cal.App.4th 445, 479 [91 Cal.Rptr.3d 309] [if control person liability were properly alleged under § 25504, plaintiffs needed to plead that they purchased securities from the company that was alleged to be liable under § 25501, not that they purchased them from the defendants alleged to be secondarily liable]; *In re ZZZZ Best Securities Litigation*[6] (C.D.Cal., July 23, 1990, No. CV 87-3574 RSWL) 1990 U.S.Dist. Lexis 11867, p. *47 (*ZZZZ Best*) [strict privity not required with defendants where liability is alleged under § 25504]; *Alameda v. Nuveen Municipal High Income*

---

[6] Although California Rules of Court, rule 8.1115 generally does not permit citation of unpublished California cases, it does not prohibit citation of unpublished federal cases. (Cal. Rules of Court, rule 8.1115; *Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1096, fn. 18 [72 Cal.Rptr.3d 112, 175 P.3d 1170].)

*Opportunity Fund* (N.D.Cal., May 20, 2009, No. C 08-4575 SI) 2009 U.S.Dist. Lexis 42637, pp. *34–*35 [strict privity not required for claims under § 25504.1]; *Openwave Systems Inc. v. Fuld* (N.D.Cal., June 6, 2009, No. C 08-5683 SI) 2009 U.S.Dist. Lexis 48206, p. *17, fn. 6 [strict privity not required where liability alleged under § 25504].) As the court in *ZZZZ Best* observed with respect to the control person liability provision of section 25504, section 25504 "does not in itself require privity. The need for privity stems from the liability derived from § 25501 which the courts[] have uniformly interpreted to require privity. [Citation.] However, this does not mean that the person alleged to be secondarily liable must be in privity with the plaintiffs. The person alleged to be controlled by the defendants must be alleged to be in privity with the plaintiffs." (*ZZZZ Best*, at p. *47; see *Apollo*, *supra*, 158 Cal.App.4th at pp. 252–257 [nonseller of securities cannot be held liable under § 25401 because he was not the direct seller, but may be secondarily liable under §§ 25504, 25504.1]; *Bains v. Moores*, at p. 479.) We agree with these courts that as long as primary liability is stated or established with the privity required by section 25501 and a violation of section 25401, secondary liability may also exist under sections 25504 and 25504.1 for others who participated in the violation in the specific roles listed in those sections without any further need for privity between these secondarily liable actors and the plaintiff. (Accord, *People ex rel. DuFauchard v. O'Neal* (2009) 179 Cal.App.4th 1494, 1502–1503 [102 Cal.Rptr.3d 573] [declining to import the privity requirement for lawsuits alleging a violation of § 25401 (through § 25501) to administrative proceedings (under § 25530) alleging a violation of § 25401].)

### B. *Privity for Purposes of a Remedy:* Viterbi v. Wasserman

In a recent decision, *Viterbi v. Wasserman* (2011) 191 Cal.App.4th 927 [123 Cal.Rptr.3d 231] (*Viterbi*), the Court of Appeal for the Fourth District concluded that secondary liability for defendants other than the seller of the security in a cause of action under section 25504 or 25504.1 depends on what remedy is available against the primary violator of the statute under section 25501. If the available remedy is rescission, according to the *Viterbi* court, then strict privity between the plaintiff and the secondarily liable defendants is necessary in order to maintain a claim. (*Viterbi*, at p. 929.) We address the impact of *Viterbi* here because it may fairly be inferred from the express allegations of the fourth amended complaint that Moss still owns the security, and accordingly, if he were able to sue alleged primary violator DLG for a violation of section 25401, his remedy against DLG under section 25501 would be rescission.[7] (*Cobb v. O'Connell*, *supra*, 134 Cal.App.4th at p. 95.)

---

[7] Moss did not specifically allege in the fourth amended complaint that he still owned the DLG note, but he alleged the following facts: when the true facts about DLG and the investments began to become known to him, he requested a refund of his investment but no

In *Viterbi, supra,* 191 Cal.App.4th at pages 931–932, the purchaser of a security sold by alleged misrepresentation attempted to sue the advisor who encouraged and facilitated the sale but was not the actual seller of the security. The *Viterbi* court observed that section 25501 provides that anyone who violates section 25401 (by buying or selling securities by means of written or oral communications containing false statements or omissions of material fact) " 'shall be liable to the person who purchases a security from him,' " and that the wronged seller " '*may sue either for rescission or for damages (if the plaintiff or the defendant, as the case may be, no longer owns the security) . . . .' " (Viterbi,* at p. 937.) Section 25501, therefore, limits a plaintiff's remedy depending on whether or not he or she still owns the security in question—if he or she retains it, then the remedy available is rescission; if not, then damages may be sought. (191 Cal.App.4th at p. 937.)

The *Viterbi* court concluded that when rescission is the only remedy available under section 25501 because the plaintiff still owns the security, no remedy is available against those persons who otherwise could be held secondarily liable under sections 25504 and 25504.1—because rescission is not available against one who is not a party to the contract. While strict privity may not be required when a party can sue for damages, as the court acknowledged (*Viterbi, supra,* 191 Cal.App.4th at p. 937), the court concluded that privity is required when a party is suing for rescission. (*Id.* at p. 929.)

*Viterbi, supra,* 191 Cal.App.4th 927, appears to lead to the inequitable outcome that the victims who are most severely damaged by misrepresentations or omissions about a security—those whose holdings are valueless and untransferable—possess fewer remedies than those who suffer less severe injury and have a security that can be transferred. It also appears that the conflation of remedy and liability in the *Viterbi* decision could lead to a situation in which the unavailability of relief against the primary actor for any reason (including, for instance, the federal stay of litigation against the alleged primary violator here) could extinguish the liability of secondary actors who otherwise would be liable under the secondary liability statutes for their participation in the transaction. These outcomes appear inconsistent with the intent to expand liability from direct violators to secondary

money was ever refunded; he was entitled to rescind his DLG investment and to the return of the $1 million he invested; and the investment program in which he participated was fraudulent and its obligations insufficiently secured. Based upon these allegations we infer that Moss continued to own the DLG Note. Our inference gains support from Moss's assertion in his opening brief that "his DLG investment was rendered worthless" when the public learned the true facts about DLG.

participants that the Legislature demonstrated by enacting the secondary liability statutes; and we think the reasoning of the *Viterbi* decision is flawed in two respects.

■    First, *Viterbi*'s analysis of what privity is required for rescission in securities fraud cases rests on federal law analyzing section 12(a)(2) of the Securities Act of 1933 (15 U.S.C. § 77*l* et seq.). (*Viterbi, supra,* 191 Cal.App.4th at pp. 937–938.) "While 'federal decisions interpreting substantially identical statutes are unusually strong persuasive precedent on construction of our own laws' [citation], . . . California's statute, while modeled on federal law, is not, on the matter of statutory seller status, 'substantially identical' to federal law." (*Apollo, supra,* 158 Cal.App.4th at p. 253.) As the *Apollo* court has explained, the federal statutes involved in the privity analysis here "impose liability only on a 'seller,' without expressly addressing the liability of participants," while California has expanded liability and "defines the liability of various participants in a transaction in separate sections of the statute," such as sections 25504 and 25504.1. (*Apollo,* at p. 253.) Federal and state laws regarding the potentially liable participants are therefore not substantially identical (*ibid.*), and we do not believe that the strict privity that federal law requires in the course of restricting liability to the primary liability of a securities seller reasonably can be imported to interpret California's statutory scheme, in which the Legislature has deliberately created secondary joint and several liability by means of statutes such as sections 25504 and 25504.1. (Accord, *Hellum v. Breyer* (2011) 194 Cal.App.4th 1300, 1310–1311 [123 Cal.Rptr.3d 803] [federal and state securities laws are not analogous for the purposes of analyzing liability of principal executive officers and directors under § 25504: federal law speaks of persons who control the primary violator, but "in enacting section 25504, the California Legislature used markedly different language, creating liability (subject to an affirmative defense) for numerous categories of individuals, including principal executive officers and directors of a corporation that is primarily liable"].)

■    Second, in its complete reliance on inapposite federal law, the analysis in *Viterbi, supra,* 191 Cal.App.4th 927 fails to take into account the very specific language of sections 25504 and 25504.1. Our first task in statutory interpretation is to examine the words of a statute, because they generally provide the most reliable indicator of legislative intent. (*Pineda v. Williams-Sonoma Stores, Inc.* (2011) 51 Cal.4th 524, 529 [120 Cal.Rptr.3d 531, 246 P.3d 612].)    ■    Sections 25504 and 25504.1 expressly extend liability from the original, direct violator of section 25401 to specific secondary actors, and they establish that these secondary actors share equal

liability with the original actor. Specifically, section 25504 provides that control persons; partners in liable firms; directors and principal executive officers of liable corporations; and employees of liable actors, broker-dealers, and agents who materially aid in the violation of section 25401 are "also liable jointly and severally with and to the same extent as" the person who directly violated section 25401 and who is liable under section 25501, unless they had no knowledge of or reasonable grounds to believe in the existence of the facts by which the liability is alleged to exist. Section 25504.1 states that any person who materially assists in the violation of section 25401 with the requisite intent "is jointly and severally liable with any other person liable" for the violation.

■ Sections 25504 and 25504.1 demonstrate the Legislature's choice to expand liability, in limited circumstances, beyond the strict privity, direct buyer and seller liability established in section 25501 to other, secondarily responsible participants in securities fraud. They express the Legislature's intent to make control persons and employees, broker-dealers and agents who materially aid in the violation, and all people who materially assist in the violation of section 25401 with the intent to deceive or defraud, equally civilly liable—on the hook to the same degree—as the direct and primary violator. Statutes such as sections 25504 and 25504.1 "specifically impose liability not only on the buyer or seller of a security but on controlling persons, associates and agents as well as aiders and abettors. These statutes indicate that the Legislature knows how to establish secondary liability when it wants to do so . . . ." (*Kamen v. Lindly* (2001) 94 Cal.App.4th 197, 204 [114 Cal.Rptr.2d 127].)

■ While we agree with the *Viterbi* court that ordinary principles of rescission require strict privity in order to rescind contracts (*Viterbi, supra,* 191 Cal.App.4th at p. 935), we conclude that the Legislature, when it enacted sections 25504 and 25504.1, intended to depart from those principles by placing these certain secondary actors in the shoes of the principal violator for the purpose of civil liability as long as the original direct violator was in privity with the plaintiff. We read sections 25504 and 25504.1 for their plain meaning: actors liable under this statute are jointly and severally liable with the primary actor for the primary actor's violation of section 25501. ■ (*Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1103 [56 Cal.Rptr.3d 880, 155 P.3d 284] [" 'If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs.' [Citations.]"].) ■ If the relief that would be available from the primary actor under section 25501 would be rescission and the return of money owing to the plaintiff, then the person who

is secondarily liable is liable for the money required to make the plaintiff whole, even if he or she may not be capable of actual rescission because he or she was not a party to the contract. Any other reading would deprive of meaning the language of sections 25504 and 25504.1 establishing joint and several liability for the secondary actors for the underlying violation of section 25501. ■■ "It is a settled axiom of statutory construction that significance should be attributed to every word and phrase of a statute, and a construction making some words surplusage should be avoided." (*People v. Woodhead* (1987) 43 Cal.3d 1002, 1010 [239 Cal.Rptr. 656, 741 P.2d 154].)

■■ The *Viterbi* approach—that an actor who cannot rescind the contract because he or she was not a party to that contract should not be liable for the funds invested in the transaction but should instead escape liability altogether because the other portion of the remedy cannot be imposed against him or her—does not fulfill the Legislature's determination in sections 25504 and 25504.1 that such an actor is to be jointly and severally liable with the primary violator. *Viterbi* makes sections 25504 and 25504.1 surplusage in their entirety whenever the wronged securities purchaser still owns the stock. Nothing in the language of the statutes directs this outcome or suggests that this was the Legislature's intent. In light of the express language of sections 25504 and 25504.1 that the specified secondary actors are jointly and severally liable with the primary actor, we respectfully disagree with *Viterbi*, *supra*, 191 Cal.App.4th 927, and hold that for secondary actors strict privity is not required to state a cause of action for violation of section 25401 by means of sections 25504 and 25504.1.

## C. *Application to the Fourth Amended Complaint*

■■ Moss alleged in his fourth amended complaint that DLG, in an issuer transaction, offered and sold Moss a DLG note by means of communications that contained untrue statements of material fact or failed to state material facts necessary to make the statements not misleading. He identified six such misrepresentations of material fact in his fourth amended complaint. With these allegations Moss stated the requisite facts for a violation of section 25401 and for primary civil liability on DLG's part by means of section 25501. Further, Moss alleged facts from which it could be concluded that the Kroner defendants acted as agents, materially assisted in the transaction, and possessed knowledge of the true facts but nonetheless continued to press for sales of the DLG notes and process those transactions. Accordingly, Moss stated a viable cause of action against the Kroner defendants for secondary liability for DLG's violation of section 25401 under sections 25504 and 25504.1, and the demurrer should not have been sustained to the second cause of action.

## DISPOSITION

The judgment is reversed with respect to the first two causes of action and the matter remanded to the trial court for further proceedings. Appellant shall recover his costs on appeal.

Woods, Acting P. J., and Jackson, J., concurred.