Filed 11/25/24  Lopez v. California Baptist University CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| BETHANY LOPEZ et al., | D083417 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. CVRI2000805) |
| CALIFORNIA BAPTIST UNIVERSITY, | |
| Defendant and Respondent. | |

APPEAL from an order of the Superior Court of Riverside, Harold W. Hopp, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Tostrud Law Group, Jon A. Tostrud; Gainey McKenna & Egleston, Gregory M. Egleston; Leeds Brown Law, Michael A. Tomkins, and Brett R. Cohen, for Plaintiffs and Appellants.

Fisher & Phillips, James J. McDonald, Jr., and Megan E. Walker, for Defendant and Respondent.

Bethany Lopez and Kirollos Kaldes[1] (Appellants) appeal the trial court's denial of their motion for certification of a class of students who attended California Baptist University (CBU) in the Spring of 2020. They contend the court misconstrued and misapplied the legal standards for adequacy, typicality, and predominance under California Code of Civil Procedure[2] section 382. Additionally, they assert the court overlooked and failed to address six central legal and factual issues that make this case ideal for class certification. Finally, they claim error in the court's analysis of their mandatory fees claims.

We conclude substantial evidence supports the trial court's finding that predominance is lacking as to Appellants' claims regarding mandatory fees under both an implied breach of contract theory and an unjust enrichment theory. Therefore, we affirm the court's order as to Appellants' mandatory fee claims.

However, we conclude the court abused its discretion in denying the class certification motion as to tuition. Specifically, we find: (1) the court applied an incorrect legal standard in deciding the parties did not have an implied tuition contract and substantial evidence does not support the court's inferences; (2) common issues of law and fact predominate under an implied contract theory with regard to tuition; (3) substantial evidence does not support the court's typicality analysis under an implied contract theory; and (4) the court applied the law incorrectly in finding Appellants unsuitable as

---

[1] Angel Cuevas withdrew as a named plaintiff on June 6, 2022.

[2] Statutory references are to the Code of Civil Procedure unless otherwise specified.

2

representatives or, at the very least, did not provide substantial evidence justifying its conclusion.

Accordingly, we remand for reconsideration of Appellants' adequacy and typicality in light of the views expressed in the opinion. Additionally, the court shall address whether substantial benefits from certification exist that render proceeding as a tuition class superior to the alternatives. If the court determines that class treatment is superior and that the proposed class representatives or substituted representatives are adequate, the court is directed to grant Appellants' motion for class certification for a class of all enrolled students in CBU's traditional undergraduate program who paid tuition during the Spring 2020 semester.

## FACTUAL AND PROCEDURAL BACKGROUND

Appellants attended CBU as undergraduate students. CBU offers both traditional and online degree programs. The tuition and some fees for the online program (CBU Online) are significantly lower than those for the traditional program. Appellants applied for, and ultimately enrolled in, the traditional program.

The path to entry started with Appellants submitting an application. CBU then sent them an acceptance letter. When the students decided to attend, they had the option to submit an intent to enroll form electronically or to sign up for a class registration date. The latter resulted in an intent to enroll form automatically being completed for them.

According to CBU's director of student accounts, all CBU students are required to electronically execute a Tuition and Fee Agreement. CBU Online and traditional students sign the same Tuition and Fee Agreement. Appellants assert they executed the Tuition and Fee Agreement and made all required payments.

3

Payment for the Spring 2020 semester was due on January 6, 2020, and classes began on January 13, 2020. However, on March 13, 2020, the Public Health Officer for the County of Riverside ordered all schools within the county, including universities, to close through April 3, 2020, because of the onset of the Covid-19 pandemic (the pandemic).[3] In response to Covid-19 concerns, CBU announced that it would extend spring break for an additional week. It also declared on March 14, 2020, that all classes would be conducted online for the remainder of the semester and that the semester would be extended an additional week. CBU's Provost and Vice President for Academic Affairs explained that almost all the school's in-person classes were moved to a live, synchronous virtual teaching modality using platforms such as WebEx. This contrasted with the asynchronous learning platform used by CBU Online, where students viewed pre-recorded class lectures on demand.

CBU did not offer any tuition or fee refunds for the Spring 2020 semester.

On August 13, 2020, Cuevas and Lopez filed an action against CBU in Los Angeles. After the court granted CBU's motion to transfer the action to Riverside County, Appellants and Cuevas filed a first amended complaint (FAC) asserting causes of action for breach of contract, breach of an implied contract, unjust enrichment, and conversion. Therein they alleged that their claims arose from CBU's decision at the end of the Spring 2020 semester to retain the full amount of tuition and fees, despite being unable to provide students, like Appellants, with access to CBU's campus and all the in-person educational services at CBU that they agreed to, contracted for, paid for, and reasonably expected to receive.

---

[3] The closure duration was later extended by amended order.

CBU filed a demurrer. The court sustained the demurrer without leave to amend as to the conversion cause of action but otherwise overruled it.

Appellants sought class certification on April 14, 2023. They defined the proposed class as "All enrolled students in California Baptist University's traditional undergraduate program who paid Tuition and/or the Mandatory Fees during the Spring 2020 semester." "Mandatory Fees" included "the following fees: General Fee, Student Services Fee, Student Health Insurance, Course fees, Lab fees, and other Academic fees." CBU only challenged the class certification element of predominance in its opposition.

Following oral argument, the court denied the motion, finding that although the class was ascertainable, Appellants had not demonstrated that a written or implied contract existed between the proposed class and CBU. As a result, it concluded that common issues of law and fact did not predominate for Appellants' breach of contract or breach of an implied contract claims. It also found common issues did not predominate for purposes of their unjust enrichment claim. Relying primarily on the conclusions drawn in its predominance analysis, the court determined Appellants had not shown their claims were typical of the proposed class's. Finally, the court found Appellants to be inadequate class representatives because their testimony and Kaldes's declaration "d[id] not demonstrate that plaintiffs understand their objections[4] [*sic*] as class representatives or their desire to represent the class." The court denied Appellants' request during the hearing to certify a narrower class on the issue of fees because the issue had not been briefed.

_____

[4]    Read in context, we presume the court meant "obligations" instead of "objections."

5

The court signed an order denying the motion on August 23, 2023, and Appellants appealed on September 20, 2023.

## DISCUSSION[5]

Appellants contend the trial court erred in construing and applying the proper standards for typicality, adequacy, and predominance. Additionally, they argue the court overlooked and failed to address six legal and factual issues that make the case ideal for class certification: namely that (1) "the nature of the contract and covenants owed by CBU to the Class members will be established through common evidence contained within standardized, template, or mass communications that were published or disseminated by CBU – during the same contract formation stages (*i.e.*, from application to admission to acceptance, enrollment, registration, and payment)"; (2) the court must objectively analyze the parties' reasonable expectations at the time the contract was formed, not at breach; (3) CBU's breach is uniform because it is based on the university-wide policy decisions to close in-person events and instruction, cancel all services for one week, and adopt a "no refund" policy; (4) the legal standard for determining breach of contract damages is an objective one that looks at "market" damages; (5) CBU's defenses apply uniformly to all class members; and (6) the existence of "CBU Online" demonstrates there are two distinct programs and pricing structures. Finally, Appellants believe the trial court overlooked their class certification

---

5      Appellants cited to many unpublished dispositions. California Rules of Court, rule 8.1115 generally does not permit citation of unpublished California cases. (Cal. Rules of Court, rule 8.1115; *Moss v. Kroner* (2011) 197 Cal.App.4th 860, 875, fn. 6.) It does not, however, prohibit citation of unpublished federal cases. (Cal. Rules of Court, rule 8.1115; *In re Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1096, fn. 18.) Therefore, we do not consider points supported solely by unpublished California cases but will consider the persuasive value, if any, of the unpublished federal decisions.

6

analysis regarding mandatory fees and conflated it with the analysis pertaining to tuition-based claims.

## I.

### *Legal Principles*

"The decision to certify a class rests squarely within the discretion of the trial court, and we afford that decision great deference on appeal, reversing only for a manifest abuse of discretion." (*Fireside Bank v. Superior Court* (2007) 40 Cal.4th 1069, 1089 (*Fireside Bank*).) "A certification order generally will not be disturbed unless (1) it is unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on erroneous legal assumptions." (*Ibid.*) The reviewing court must examine the trial court's reasons for denying class certification bearing in mind that " 'Any valid pertinent reason stated will be sufficient to uphold the order.' " (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 436.)

Section 382 authorizes a class action "when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court." (§ 382; *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021 (*Brinker*).) A party seeking class treatment "must demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives." (*Brinker*, at p. 1021; § 382.) "[T]he 'community of interest requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class.' " (*Fireside Bank*, *supra*, 40 Cal.4th at p. 1089.)

"The certification question is 'essentially a procedural one that does not ask whether an action is legally or factually meritorious.' [Citation.] A trial court ruling on a certification motion determines 'whether . . . the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' " (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326 (*Sav-On*).) However, "To the extent the propriety of certification depends upon disputed threshold legal or factual questions, a court may, and indeed must, resolve them." (*Brinker*, *supra*, 53 Cal.4th at p. 1025.)

## II.

### *Analysis*

CBU did not dispute below that the proposed class was sufficiently ascertainable and numerous and does not challenge the trial court's holding that it indeed was ascertainable, so we do not address these issues. Instead, we consider Appellants' challenges to the court's finding that they did not demonstrate a community of interest.

A. Predominance

    1. *Additional Facts*

In its written order, the court concluded Appellants and CBU did not have an express written contract promising in-person, on-campus education.[6] The court noted that the Tuition and Fee Agreement does not state that the students' education will be in-person nor does it apply only to traditional undergraduate students. Further, the court highlighted that the course catalogs specifically say they are not contracts and are subject to change.

As to whether a contract could be implied, the court found that "It is hard to conclude that the members of the class had the same expectations or engaged in the same conduct to support a finding that common questions predominate on the breach of implied contract cause of action." The court distinguished the case of *Kashmiri v. Regents of University of California* (2007) 156 Cal.App.4th 809, 831–832 (*Kashmiri*), which Appellants relied upon, noting that, unlike here, that case involved a clear policy promise by the university that was communicated to the students. It elaborated as follows:

> "The Court in *Kashmiri* also makes clear that school catalogues and websites are not necessarily binding on a university. 'If the catalogue or the Web site of the university does not expressly state that it intends to be bound by these statements, such statements become part of the enrollment agreement only if they are implied-in-fact contract provisions.' [*Kashmiri, supra*, 156 Ca1.App.4th] at 829. Whether a catalogue or other publication by a university becomes a contractual obligation depends on general contract principles. *Id.* Further, the *Kashmiri* court stated that 'Courts have been reluctant to apply contract law to general promises or expectations.' *Id.* at 826. Here, plaintiffs have not identified any specific promise of in-person, on-campus

---

6    Appellants' counsel effectively conceded as much at the hearing.

education, although that general concept is something that students in the traditional undergraduate program may have had. But this at best constitutes a general expectation to which *Kashmiri* says courts are reluctant to apply contract law.

"It is difficult to conclude that the parties had a reasonable expectation if there were a worldwide pandemic that required a state of emergency from the state and federal governments that resulted in closures of many businesses and strict limits on meetings of groups of people and additional measures to protect public health that likely caused considerable increase in the expense of operating a university, that CBU would not go to remote learning as a substitute for in-person, on-campus education without a refund of some unspecified amount of tuition or mandatory fees. Moreover, '[t]he reasonableness of the student's expectation is measured by the definiteness, specificity, or explicit nature of the representation at issue.' *Kashmiri*, [*supra*,] 156 Cal.App.4th at 832. Given that plaintiffs are unable to identify a definite, specific or explicit representation, this supports not certifying a class."

The court went on to explain that the third cause of action for unjust enrichment was based upon "the payment of tuition and fees for certain service and CBU's retention of the fees without fully providing the services the fees covered." As to the fees in particular, the court noted that, while some of the fees appeared to apply to the entire class, many did not. The court also observed a difference in fees paid depending on how many units a student was taking. CBU had provided evidence showing that some services were provided remotely after the pandemic began (e.g. counseling, tutoring, student government), labs were held either remotely or in person, and students could access medical care and were allowed access to buildings and equipment for which fees were charged. Because this evidence showed that services were provided to some class members, the court found it less likely that common issues predominated. Additionally, the court pointed out that

Appellants had not identified which specific fees they were challenging or what services were not provided.

In the court's view, the fact that services were provided to some class members "might also show that there was nothing unjust in CBU retaining the fees." Regardless, the court determined, "There is insufficient support for the Court to find what class members believed they were paying for and what they would receive for the tuition and fees they paid. Whether the services provided were sufficient or met expectations is something that must be determined on an individual basis." For all these reasons, the court concluded that common questions did not predominate on the third cause of action.

2. *Analysis*

"Predominance is a factual question; accordingly, the trial court's finding that common issues predominate generally is reviewed for substantial evidence." (*Brinker*, *supra*, 53 Cal.4th at p. 1022.) To determine whether substantial evidence supports the order denying certification, we look at the allegations in the complaint and the declarations of counsel to see if "the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment." (*Sav-On*, *supra*, 34 Cal.4th at p. 327.) As with any review of the legal sufficiency of the evidence, we must first "resolve all explicit conflicts in the evidence in favor of the respondent and presume in favor of the judgment all *reasonable* inferences" and then determine whether that evidence is substantial. (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1632–1633 (*Kuhn*).) Evidence that is "qualified, tentative and conclusionary" is not substantial. (*Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal.4th 1096, 1111.) To be substantial, the evidence must be " ' "of ponderable legal

11

significance . . . reasonable in nature, credible, and of solid value[.]" ' " (*Sav-On*, *supra*, 34 Cal.4th at p. 329.)

In conducting this review, "we may not substitute our own judgment for that of the trial court." (*Dailey v. Sears, Roebuck & Co.* (2013) 214 Cal.App.4th 974, 992.) That being said, we may not affirm on substantial evidence review based only on isolated evidence supporting the judgment without considering the entire record. (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 652 (*Roddenberry*).) "The ultimate determination is whether a *reasonable* trier of fact could have found for the respondent based on the *whole* record." (*Kuhn*, *supra*, 22 Cal.App.4th at p. 1633.)

Likewise, "While substantial evidence may consist of inferences, such inferences must be 'a product of logic and reason' and 'must rest on the evidence' [citation]; inferences that are the result of mere speculation or conjecture cannot support a finding [citations]." (*Kuhn*, *supra*, 22 Cal.App.4th at p. 1633.) " 'Reasonable' inferences do not include those which

are contrary to uncontradicted evidence of such a nature that reasonable people would not doubt it."[7] (*Kuhn*, at p. 1633, fn. 4.)

### a. Tuition

Appellants maintain that in determining "Plaintiffs have failed to demonstrate predominance because Plaintiffs failed to identify a 'specific promise for in-person, on-campus education,' " the trial court misread and ignored the critical holding in *Kashmiri* regarding breach of an implied contract. Specifically, Appellants contend the court did not look at the totality of the circumstances and evaluate the reasonable expectations of the parties at the time of contracting.

Because the court and Appellants rely so heavily on *Kashmiri*, we begin by providing a summary. That case involved three subclasses of students who attended school at various University of California campuses. (*Kashmiri*, *supra*, 156 Cal.App.4th at pp. 814, 819.) The university assessed

---

[7]    Our Supreme Court has quoted former Chief Justice Traynor in further elaborating on this principle: "A formulation of the substantial evidence rule which stresses the importance of isolated evidence supporting the judgment, however, risks misleading the court into abdicating its duty to appraise the whole record. As Chief Justice Traynor explained, the 'seemingly sensible' substantial evidence rule may be distorted in this fashion, to take 'some strange twists.' 'Occasionally' he observes, 'an appellate court affirms the trier of fact on isolated evidence torn from the context of the whole record. Such a court leaps from an acceptable premise, that a trier of fact could reasonably believe the isolated evidence, to the dubious conclusion that the trier of fact reasonably rejected everything that controverted the isolated evidence. Had the appellate court examined the whole record, it might have found that a reasonable trier of fact could not have made the finding in issue. One of the very purposes of review is to uncover just such irrational findings and thus preclude the risk of affirming a finding that should be disaffirmed as a matter of law.' " (*People v. Johnson* (1980) 26 Cal.3d 557, 577–578 quoting Traynor, The Riddle of Harmless Error (1969) p. 27) (fns. omitted); accord *Roddenberry*, *supra*, 44 Cal.App.4th at p. 652.)

13

all students an educational fee and required some graduate students to pay a professional degree fee (PDF).[8] (*Id.* at p. 815.) It represented in various materials that the PDF would not increase for the duration of the graduate students' enrollment. (*Id.* at pp. 815–816.) However, each year from 2002 to 2006, the university increased the PDF for continuing students. (*Id.* at pp. 817–818.) The students sued, asserting a breach of contract claim. (*Id.* at p. 819.)

The court granted summary judgment in favor of the students, finding the university had breached an enforceable contract not to increase the PDF throughout their enrollment. (*Kashmiri, supra,* 156 Cal.App.4th at p. 821.) The First Appellate District affirmed on appeal. (*Id.* at p. 841.) The reviewing court explained, "the basic legal relationship between a student and a private university is contractual in nature[,]" and " ' "[B]y the act of matriculation, together with payment of required fees, a contract between the student and the institution is created. . . ." ' " (*Id.* at pp. 823–824.) Although courts "have recognized that contract law should not be strictly applied" to this relationship (*id.* at p. 824), the *Kashmiri* court noted that "Courts have uniformly held that a contract between an educational institution and a student 'confers duties upon both parties which cannot be arbitrarily disregarded and may be judicially enforced.' " (*Id.* at p. 826.)

Because there was no formal agreement between the parties, the reviewing court concluded they had an implied-in-fact contract. (*Kashmiri, supra,* 156 Cal.App.4th at p. 827.) Pursuant to Civil Code section 1621, the

---

8    The court certified all three subclasses (*Kashmiri, supra,* 156 Cal.App.4th at p. 819), but we omit any summary of two of the subclasses because only the discussion of the PDF fee assessed to the subclass of graduate students is relevant to our analysis here.

existence and terms of an implied contract are manifested by conduct. (Civ. Code, § 1621; *Kashmiri*, at p. 827.) In assessing whether the university's statements in its catalogs and on its website that it would not raise the PDF for continuing students became a term of the implied contract, the court applied standard rules of contract law. (*Kashmiri*, at p. 831.) It explained that "In interpreting the contract, we must 'give effect to the mutual intention of the parties as it existed' at the time the contract was executed." (*Id.* at p. 831 citing Civ. Code, § 1636.) To determine the reasonable expectation of the parties, the court instructed that courts must examine " 'the totality of the circumstances.' " (*Kashmiri*, at p. 832 quoting *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 681 (*Foley*).) In the court's view, "The reasonableness of the student's expectation is measured by the definiteness, specificity, or explicit nature of the representation at issue" (*Kashmiri*, at p. 832) and should not be based on either party's subjective intentions. (*Id.* at p. 838.)

Regarding the PDF, the First Appellate District concluded it was "not qualified by any language suggesting that this was merely an expectation" or

a general statement.[9]  (*Kashmiri, supra,* 156 Cal.App.4th at p. 833.)  Rather, it found the promise regarding the PDF was a "specific promise" and, thus, "the reasonable expectation of the parties would be that once the student enrolls in the University and the University accepts his or her payment of the PDF, the PDF will remain the same for the duration of the student's enrollment in that program."  (*Ibid.*)  Although the university's publications contained general disclaimers that fees could change without notice, the court found that the university's expression of its specific intent not to raise the PDF for continuing students controlled over the inconsistent general disclaimers.  (*Ibid.*)

While we agree with the lower court here that *Kashmiri* sets forth the appropriate standards for evaluating the existence and terms of an implied

---

9     Earlier, citing for support only a 1977 opinion from the District of Columbia Court of Appeals, the *Kashmiri* court stated, "Courts also have been reluctant to apply contract law to general promises or expectations." (*Kashmiri, supra,* 156 Cal.App.4th at p. 826 citing *Basch v. George Washington University* (D.C. 1977) 370 A.2d 1364, 1366–1367 (*Basch*).)  We do not read the *Basch* opinion as holding anything beyond what the *Kashmiri* court already stated, which is that whether language in university bulletins becomes part of a contractual obligation depends on general principles of contract interpretation in light of the totality of the circumstances.  (See *Basch*, at pp. 1366–1367.)  In that case, the bulletin provided, among other statements, "estimated" academic year tuition increases but stated that "it is not possible to project future economic data with certainty, and circumstances may require an adjustment in this estimate." (*Id.* at p. 1365.)  When the university then increased tuition beyond the estimates, student sued and argued that "the words 'estimated,' 'approximate,' and 'projected,' found in the tuition paragraph in the bulletin, d[id] not render the paragraph too illusory to be construed as laying down a contractual obligation on the part of the University." (*Id.* at p. 1367.)  The court disagreed, concluding a reasonable person would not have assumed the university intended to bind itself because the words expressed, at best, an expectancy regarding future increases, "not a promise susceptible of enforcement." (*Id.* at pp. 1367–1368.)

16

contract, the court somewhat selectively applied these legal standards, and it is not clear the court considered all the evidence before it of the parties' conduct and reasonable expectations. The court latched onto the *Kashmiri* court's statement that courts have "been reluctant to apply contract law to general promises or expectations" (*Kashmiri, supra*, 156 Cal.App.4th at p. 826) and then labeled the putative class's anticipation of an in-person, on-campus education a general expectation "at best" without identifying any qualifying language similar to that present in *Basch*. It appeared to find significant that, unlike in *Kashmiri*, no "clear policy" was "communicated to the students." We find these statements concerning, as it appears that in attempting to distinguish *Kashmiri*, the court failed to appropriately apply the principles of contract interpretation.

Specifically, in focusing almost exclusively on whether CBU made a definite promise of an in-person education in its publications, the court did not appear to determine whether an implied contract was manifested by the parties' conduct (Civ. Code, § 1621). "[A] contract implied in fact 'consists of obligations arising from a mutual agreement and intent to promise where the agreement and promise have not been expressed in words.' " (*Retired Employees Assn. of Orange County, Inc. v. County of Orange* (2011) 52 Cal.4th 1171, 1178 quoting *Silva v. Providence Hospital of Oakland* (1939) 14 Cal.2d 762, 773 (*Silva*).) What we find most remarkable here is that the court did not even mention the undisputed fact that CBU offered students the option of an entirely online, and significantly less expensive, education through CBU Online. Appellants provided evidence of CBU's uniform pricing structure listing the tuition rate for traditional students and that for online students. Once one factors in the existence of CBU Online, we are hard-pressed to understand what other reasonable expectation the students may

17

have had regarding what the traditional program offered other than an in-person, on-campus education. The CBU Undergraduate Catalog says, "Completion of the registration process constitutes a contract and obligates the student for full payment." The proposed class of students registered for, paid for, and thus contracted for the traditional program instead of CBU Online. When the representations the CBU publications made about being on campus are read in conjunction with their explanation of what CBU Online offered,[10] there appears to be little question as to what was offered by the traditional program.[11]

To the extent the court viewed CBU Online as a topic that was included in its discussions of CBU's catalogs and publications, some explanation was

---

[10] For example, one page of a document entitled, "President's Report 2020," which the content thereof implies was issued prior to March 2020, reads: "The campus and holdings of California Baptist University comprise some 191 acres and feature 223 buildings with more than 1.9 million square feet under roof. [¶] . . . [¶] CBU offers *off-site* classes through the division of Online and Professional Studies (OPS)." (Italics added.) At the end of the report, it lists "Undergraduate Programs," "Graduate Programs," and "Online and Professional Studies" under three separate headings.

[11] The parties' subsequent conduct also evidenced a similar meeting of the minds. (See *Guz v. Bechtel Nat. Inc.* (2000) 24 Cal.4th 317, 337.) The students enrolled in classes that were primarily to be held on campus, showed up to the campus, and attended most, if not all, classes in person. We infer from the absence of evidence to the contrary in the record that professors appeared in the classrooms and taught the students. It is "well settled in our law" that such subsequent performance under a contract "should be used as a reliable means of interpreting an ambiguous contract." (*Crestview Cemetery Assn v. Dieden* (1960) 54 Cal.2d 744, 752–753.) " 'The acts of the parties under the contract afford one of the most reliable means of arriving at their intention; and, while not conclusive, the construction thus given to a contract by the parties before any controversy has arisen as to its meaning will, when reasonable, be adopted and enforced by the courts.' " (*Id.* at p. 753.)

18

warranted as to how else CBU's representations could be interpreted. (See *Silva, supra*, 14 Cal.2d at p. 774 ["before a contract may be implied, it must be determined, as a question of fact, whether the parties acted in such a manner as to provide the necessary foundation for it, and evidence may be introduced to rebut the inferences and show that there is another explanation for the conduct"]; accord *Foley, supra*, 47 Cal.3d at p. 677.) "If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it." (Civ. Code, § 1649.) Here, CBU argued, and the court essentially ruled, that CBU did not promise what the students thought it did, without offering any plausible alternative interpretation. However, CBU's 2019–2020 Undergraduate Catalog lists the full-time tuition for traditional students taking 13-18 units as $16,471 per semester and the cost per unit above or below that as $1,267. Meanwhile, the cost per unit for online students was only $613. The record contains no evidence or inferences, substantial or otherwise, explaining what other understanding the CBU students could have had as to what they would receive by paying up to more than double the online tuition rate. While the *Kashmiri* court cautioned against relying upon general expectations, in the absence of any other plausible explanation, it seems disingenuous to simply label this general expectation and conduct no further analysis.

CBU relies heavily on the recent case of *Berlanga v. University of San Francisco* (2024) 100 Cal.App.5th 75, which involved a similar class claim against a university for transferring to remote education. That court concluded, "While we recognize that all parties expected classes to be conducted in-person, those general expectations do not amount to an enforceable term of the parties' contract." (*Id.* at p. 86.) However, unlike

19

CBU, the university in *Berlanga* did not offer an online option prior to the pandemic. Moreover, like *Kashmiri*, the holding in *Berlanga* addressed an order denying summary judgment, not a class certification motion. Finally, the *Berlanga* court cited for this general expectations proposition the portion of *Kashmiri* that relied on the fact-specific *Basch* holding. As a result, we do not find this case dispositive.

At the class certification stage, we are not concerned with the merits of the case but with whether it would be "both desirable and feasible" to resolve the issues in a single class proceeding. (*Brinker, supra,* 53 Cal.4th at pp. 1021−1022.) In this case, because the proposed class is defined simply as all students enrolled in CBU's traditional undergraduate program who paid tuition during the Spring 2020 semester, there are no other contract terms to imply and the maintenance of this class appears feasible. The traditional students paid the traditional tuition rate and allege CBU uniformly breached the implied agreement as to all class members when it closed the campus, prevented the students from attending classes on-campus or in-person, and declined to issue a refund. Although we recognize the equally undisputed fact that some traditional students enrolled in a few online classes prior to the pandemic, this would not appear to impact the predominance analysis because these students paid the traditional tuition rate instead of the lower CBU Online rate for those courses. Thus, their conduct still demonstrated a reasonable expectation that most of their classes would be in-person— particularly since CBU did not provide evidence showing that any traditional students took all or most of their classes online. In other words, common issues of law and fact predominate for a class defined as all students enrolled in CBU's traditional undergraduate program who paid tuition during the Spring 2020 semester.

We also do not find substantial evidence in the record to support the court's conclusion that, "It is difficult to conclude that the parties had a reasonable expectation if there were a worldwide pandemic that required a state of emergency from the state and federal governments that resulted in closures of many businesses and strict limits on meetings of groups of people and additional measures to protect public health that likely caused considerable increase in the expense of operating a university, that CBU would not go to remote learning as a substitute for in-person, on-campus education without a refund of some unspecified amount of tuition or mandatory fees."  Appellants read this finding as shifting the analysis of the parties' reasonable expectations to focus on the time of breach instead of the time of contract formation.  Further, they argue the trial court interpreted the breach of contract to be a breach of the covenant to issue a refund in the event of a pandemic—a covenant Appellants have not asserted.

Although the court's meaning is not entirely clear, we believe the court was referring to the parties' reasonable expectations at the time of contract formation.  Nonetheless, to the extent any party contemplated how CBU might respond to an unexpected and unprecedented global pandemic, we do not find substantial evidence in the record providing any hint that the students would not have reasonably expected a partial refund.  "Speculation or conjecture alone is not substantial evidence." (*Roddenberry, supra*, 44 Cal.App.4th at p. 651.)  A court may draw an inference from the evidence, but "An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action" (Evid. Code, § 600, subd. (b)), not from the absence of facts.  Here, we are aware of no information upon which this inference is based, making it nothing more than speculation.  Moreover, the one fact that may have had

21

some bearing—the existence of CBU Online, which the court did not mention—would more likely lead to the opposite inference. To the extent the students could reasonably foresee that CBU would transfer to remote learning during a pandemic, they might reasonably expect to shift to CBU Online and receive a refund based upon the published tuition differential.

In evaluating the court's omission of any reference to CBU Online, despite the issue being raised in Appellants' briefing and at the motion hearing, we acknowledge that under established rules of appellate review, " 'A judgment or order of the lower court is *presumed correct*. . . . [and] [a]ll intendments and presumptions are indulged to support it on matters as to which the record is silent.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) However, it is equally true we must "presume in favor of the judgment all *reasonable* inferences" and then determine whether the evidence supporting the judgment is substantial. (*Kuhn*, *supra*, 22 Cal.App.4th at pp. 1632–1633; accord *Kao v. Joy Holiday* (2020) 58 Cal.App.5th 199, 206.) On this record, an inference that the court considered Appellants' awareness of CBU Online but determined this uncontradicted fact was not relevant to determining the parties' mutual intentions at the time the contract was formed is not reasonable or logical. (*Kuhn*, at p. 1633 ["While substantial evidence may consist of inferences, such inferences must be 'a product of logic and reason' . . ."].) As previously noted, "The ultimate determination is whether a *reasonable* trier of fact could have found for the respondent based on the *whole* record." (*Ibid*.) Here, we conclude it could not. Thus, the court abused its discretion in concluding

22

common issues of law and fact did not predominate under Appellants' implied contract theory.[12]

On a final note, it does not alter our conclusion that the court did not address Appellants' contention that their market damages model supported their predominance argument. Generally speaking, " 'a class action is not inappropriate simply because each member of the class may at some point be required to make an individual showing as to his or her eligibility for recovery or as to the amount of his or her damages.' " (*Sav-On, supra,* 34 Cal.4th at p. 333.) Thus, even if the court had concluded Appellants' damages model would require some individualized damages assessments, this would not defeat certification.

### b. Fees

Appellants challenge three aspects of the court's holding regarding the predominance of their mandatory fees claims.

First, Appellants argue the trial court erred in concluding they failed to identify the mandatory fees at issue. The court stated, "Plaintiffs do not identify what specific fees they are challenging or what services were not

---

[12]    Regarding Appellants' unjust enrichment claim, the court concluded there was "insufficient support for the Court to find what class members believed they were paying for and what they would receive for the tuition and fees they paid. Whether the services provided were sufficient or met expectations is something that must be determined on an individual basis. For all these reasons, common questions do not predominate on the third cause of action" for unjust enrichment. However, the court's analysis primarily pertained to fees, not tuition. As a result, it is not clear what evidence or inferences the court relied upon in finding common issues regarding tuition did not predominate under an unjust enrichment theory. However, because we conclude the court erred in finding an implied contract regarding tuition did not exist, we need not address Appellants' arguments under the alternate unjust enrichment theory.

provided." We tend to agree with Appellants. The court noted in footnote 2 of its order that "The motion defines mandatory fees as including general fee, student services fee, student health insurance, course fees, lab fees and other academic fees. Mtn at 1, fn. 1." However, the court neglected to note that the same footnote to Appellants' class certification motion cited "Exhibit (Ex.) C to the Declaration of Brett Cohen . . . (reflecting the uniform CBU pricing, including for various programs and various fees associated with the same)." Exhibit C is included in the record and does, indeed, contain CBU's 2019–2020 tuition and fees price sheet listing every single fee that may be charged. Although there may be some confusion because course fees and lab fees are listed under the heading "Academic," it seems reasonably clear to which fees Appellants referred. Accordingly, we conclude the first part of this holding was not supported by substantial evidence. However, as we will discuss *post*, Appellants did not, in fact, identify what services were not provided.

Appellants next contend the court erred by lumping all the mandatory fees into one summary analysis instead of recognizing uniformity in how CBU's "General Fee" and "Student Services Fee" are charged and how the no-refund policy was applied. In their view, the court should have at least certified a fee-based class as to the "General Fee" and the "Student Services Fees."

First, as the analysis at the class certification stage is whether the fee claims are amenable to class treatment, it was reasonable for the court to consider all the fees together. Second, the court did address Appellants' suggestion that it certify a narrowed class, stating, "The Court will not rule

24

on this possibility because the parties have not fully briefed it." We find no error with this conclusion.[13]

Finally, Appellants assert the court improperly conducted a merits-based analysis of the fee claims. They submit that the issue at this stage is whether their theory is susceptible to common proof and that any individualized issues pertain to questions of appropriate damages, not to the alleged existence (or breach) of an implied contract to provide in-person instruction and campus facilities in exchange for mandatory fee payments. We disagree that the investigation of individualized fee issues applies only to damages.[14]

Whether CBU and any individual student had an implied contract requiring CBU to provide in-person instruction or access to campus facilities in exchange for mandatory fees turns on individualized determinations of

---

[13] Furthermore, as described in further detail below, substantial evidence supported the court's conclusion that the fees claims were not amenable to class treatment. For example, as to these two fees in particular, evidence in the record demonstrates that students paid different general fee amounts based on the number of units of credit they were taking and that the student services fee differed if the student was living on campus versus off campus.

[14] Before we address this issue, we observe that the court applied the same implied breach of contract analysis to fees as it did to tuition, without highlighting any potential distinctions regarding predominance. But, in subsequently evaluating Appellants' unjust enrichment claim, the court focused primarily on issues relevant solely to fees. Although we did not find substantial evidence in the record to support the court's conclusion that "It is hard to conclude that the members of the class had the same expectations or engaged in the same conduct to support a finding that common questions predominate on the breach of implied contract cause of action" concerning tuition, the rationale and evidence the court provided under the heading of unjust enrichment does provide substantial evidence supporting its finding under both an implied contract theory and an unjust enrichment theory as to fees.

which fees that student paid. And, whether the student actually received the benefit they reasonably could be expected to anticipate, such that CBU could be said to have breached that implied contract, also requires an individualized assessment. In their class certification motion, Appellants phrased the purportedly common question as being, "Did CBU breach its contracts with Plaintiffs and the Class by failing to provide the services and facilities to which the Mandatory Fees pertained after mid-March 2020?" However, as the court correctly noted, Appellants did not identify which services were not provided. Further, CBU filed extensive evidence showing each student was assessed a different combination of fees based upon their number of credit hours and academic program. It also provided declarations explaining that some fees were used as intended at the beginning of the semester before the pandemic even started, others were used as intended after the pandemic started, and the benefit of some was provided in a modified fashion.[15] This information shows the parties and the court would

---

[15] For example, Mark Howe, CBU's Vice President of Finance and Administration, explained in his declaration that a portion of the General Fee was allocated to the General Fund, which "went to offset a portion of the operating expenses related to processing students' financial aid awards, academic advising and degree plans, transcripts by the registrar, and semester billing by student accounts." Notably, some of these uses have nothing to do with in-person, on-campus education. Mr. Howe also asserted that "All regular student financial aid for the Spring 2020 Semester was already awarded by March 16, 2020. CBU's Financial Aid office remained in operation for the remainder of the Spring 2020 Semester, however, and among other activities, distributed Cares Act funds to students. The Student Accounts office also remained in operation for the remainder of the Spring 2020 Semester." Mr. Howe also explained that:

> "For students taking 6 or more units of credit, $65.00 of the General Fee was allocated to technology. For students taking 5 or fewer units of credit, $25.00 of the General Fee was allocated

26

have to investigate the facts as to each individual class member to determine which fees that person was assessed (i.e., which implied contracts they purportedly entered into), to what extent they received any benefit from them, and to what extent, if any, CBU had therefore breached an implied contract with each student.

Furthermore, given that each student paid a different combination of fees, this issue also does not appear amenable to the creation of subclasses. Although the legal standard for commonality is comparative (*Sav-On*, *supra*, 34 Cal.4th at p. 339), it is not clear from the record that the costs and benefits of adjudicating Appellants' fee claims in a class action would be less than the costs and benefits of proceeding by numerous separate actions (*id.* at p. 339, fn. 10).  Therefore, we conclude the lack of uniformity provided substantial

---

to technology.  These funds went to offset a portion of the operating expenses related to classroom, computer lab and online learning equipment and technology; campus-wide internet and wi-fi; and software used throughout the University for academic and student services related functions.  Some of these funds were used to build out CBU's technology infrastructure to enable the shift of classes to synchronous remote learning in Spring 2020. The software acquired with these technology funds continued to be used by CBU in providing academic and student services after March 16, 2020."

Charles D. Sands, the Provost and Vice President for Academic Affairs at CBU, clarified in his declaration that although most labs met virtually after the shutdown, some "continued to meet in person."  He said, "Our Social Work practicums continued to meet in person as they were considered critical infrastructure.  Our Aviation labs, for which students pay the highest lab fees at CBU, continued to meet for flying lessons and check rides as they were also considered critical infrastructure."  Likewise, architecture students continued to have access to the studio that housed equipment funded by their program fees.

27

evidence supporting the court's holding under the breach of an implied contract claim that a class based on payment of mandatory fees is not "likely to prove amenable to class treatment." (*Id.* at p. 327.) Likewise, because the lack of uniformity regarding fees similarly impacts the representatives' ability to demonstrate predominance for purposes of the unjust enrichment claim, we also affirm the court's holding on that issue as supported by substantial evidence.[16]

B. *Adequacy*

Appellants argue the court's conclusion that they are not adequate representatives represents a departure from the appropriate class certification standards under section 382 as well as a misstatement and misapplication of the record supporting their adequacy. We agree.

The court relied upon *Earley v. Superior Court* (2000) 79 Cal.App.4th 1420, 1434 (*Earley*) for the proposition that a class representative has fiduciary responsibility to prosecute the action on behalf of absent parties, which includes the responsibility to try the case, appear in court, and work with counsel on behalf of the absent class members. Citing *Jones v. Farmers Insurance Exchange* (2013) 221 Cal.App.4th 986, 998 (*Jones*), the court further stated that a class certification motion may be denied because of the failure of the named plaintiff to understand his or her obligations or because of a lack of desire to represent the class. In our view, the court reads both these cases as establishing factors upon which a plaintiff may be deemed inadequate that are unsupported by the authority on which they rely.

---

[16] Because we conclude there is substantial evidence to support the court's finding that predominance is lacking as to fees, we need not address the other class certification elements as to fees.

Both cases can be traced back to our high court's discussion of adequate representation in *La Sala v. American Sav. & Loan Assn.* (1971) 5 Cal.3d 864 (*La Sala*). In that case, the defendants demurred to the named plaintiffs' class complaint and, without ruling, the court dropped the matter from the calendar holding "only that the named plaintiffs, by reason of the benefits they received from defendants, no longer controverted the issue with defendants and thus became disqualified to represent the class." (*Id.* at pp. 870–871.) Before addressing the merits of their appeal, our high court noted that the procedural posture of the case was unusual in that the trial court had not determined that the complaint failed to frame a proper class action, nor had it found at the commencement of the action that the named plaintiffs were not suitable representatives. (*Ibid.*)

Turning to the issue presented, the court acknowledged that, "When a plaintiff sues on behalf of a class, he assumes a fiduciary obligation to the members of the class, surrendering any right to compromise the group action in return for an individual gain. Even if the named plaintiff receives all the benefits that he seeks in the complaint, such success does not divest him of the duty to continue the action for the benefit of others similarly situated." (*La Sala*, *supra*, 5 Cal.3d at p. 871.) Our high court concluded the defendants' offer to resolve the issue underlying the complaint as to the named plaintiffs "d[id] not mechanically render those plaintiffs unfit per se to continue to represent the class." (*Id.* at p. 871.) Rather, in exercising its discretion to decide "Whether the named plaintiffs will fairly and adequately protect that class[,]" the court could "take into account that the named plaintiffs have already obtained their individual benefits from the action." (*Id.* at pp. 871–872.) This was because in some, but certainly not all cases, "plaintiffs who have nothing at stake often will not devote sufficient energy to

29

the prosecution of the action" or, having received benefits, will have a conflict of interest with the class. (*Id.* at p. 872.) The *La Sala* court then instructed that, should the court conclude "the named plaintiffs can no longer suitably represent the class, it should at least afford plaintiffs the opportunity to amend their complaint, to redefine the class, or to add new individual plaintiffs, or both, in order to establish a suitable representative." (*Ibid.*)

This holding is in keeping with subsequent authority that " 'It is axiomatic that a putative representative cannot adequately protect the class if his interests are antagonistic to or in conflict with the objectives of those he purports to represent.' " (*Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 470 (*Richmond*).) However, " 'only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status.' " (*Ibid.*)

The court in *Earley* was not focused on this issue because the question before it was whether absent class members could be held liable for a successful defendant's attorney fees and costs. (*Earley*, *supra*, 79 Cal.App.4th at p. 1431.) Thus, we do not find the *Earley* court intended to set forth additional factors for determining the adequacy of a proposed class representative. Likewise, in citing to a case that borrowed the language from *Earley* regarding a class representative's fiduciary obligations, the *Jones* court was faced with a proposed class representative who had not filed a declaration at all. As our high court has made clear, the party seeking class certification has the burden to prove its representatives are adequate (*Richmond*, *supra*, 29 Cal.3d at p. 470), so ultimately it was the failure to satisfy this burden that caused the *Jones* court to affirm the trial court's finding that the plaintiff had not satisfied the adequacy requirement. (*Jones*, *supra*, 221 Cal.App.4th at p. 999.)

The facts are distinguishable here. As a result, we conclude the court applied the law incorrectly in finding Appellants unsuitable as representatives or, at the very least, did not provide substantial evidence justifying its conclusion. The court's first issue with the motion was that Lopez did not submit a declaration. However, unlike in *Jones*, Lopez instead provided sworn deposition testimony affording a basis for evaluating her adequacy. Thus, we are not persuaded that this reason justifies the court's finding.

The court's other reason for finding Appellants inadequate was that the deposition testimony and Kaldes's declaration did "not demonstrate that plaintiffs understand their [obligations] as class representatives or their desire to represent the class." Earlier references to fiduciary obligations suggest the court found their testimony insufficient because they did not express an understanding that they would serve as fiduciaries for the class. Initially, as explained *ante*, we do not find that this language from *Earley* about understanding and desire was intended to provide new factors for assessing adequacy. Although the high court in *La Sala* said representative plaintiffs serve as fiduciaries, it did not hold that they may be deemed inadequate based solely on a perceived lack of understanding of their full duties. This was not a situation like the one presented in *La Sala* where the named plaintiffs no longer had a stake in the outcome of the case and might, therefore, have been less motivation to understand or fulfill their duties. Thus, Appellants' failure to demonstrate these attributes is not alone sufficient justification.

Instead, the court must reach a conclusion as to whether Appellants "will fairly and adequately protect th[e] class" (*La Sala, supra*, 5 Cal.3d at

31

p. 871), which it did not do here.[17]  The court also did not conclude Appellants' interests were " 'antagonistic to or in conflict with the objectives' " they purport to represent.  (*Richmond, supra*, 29 Cal.3d at p. 470.)  Accordingly, we reverse and remand for consideration of this factor under the appropriate standard.

On remand, the court must consider Appellants' ability to represent the class under the applicable standard set forth *ante*, bearing in mind that " 'only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status.' " (*Richmond, supra*, 29 Cal.3d at p. 470.)  "The lack of an adequate class representative, however, does not justify the denial of the class certification motion.  Instead, the trial court must allow Plaintiffs an opportunity to amend their complaint to name a suitable class representative." (*Jones, supra*, 221 Cal.App.4th at p. 999 citing *La Sala, supra*, 5 Cal.3d at p. 872.)

C.  *Typicality*

"Certification requires a showing that the class representative has claims or defenses typical of the class." (*Fireside Bank, supra*, 40 Cal.4th at p. 1090.)  As the court correctly stated, " ' "The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.' " ' " (*Martinez v. Joe's Crab Shack Holdings* (2014) 231 Cal.App.4th 362, 375.)

---

17    To the extent we might strain to infer the court meant Appellants could not adequately protect the class because they did not understand their duties, we would require some factual basis for the court's finding upon which to judge this inference.  The court offered none.

The court here found it "unclear whether other class members have been injured by the same course of conduct as plaintiffs." It based its conclusion that Appellants had not demonstrated that their injuries were typical of the class members on the fact that: (1) they "fail[ed] to identify any contract provision that they and the potential class members are parties to, as asserted in the first cause of action"; (2) "it [was] unclear whether class members received the same marketing materials as plaintiffs and experienced the same conduct to give rise to an implied contract with the same terms"; and (3) it was not clear what mandatory fees Appellants' challenged or whether the class members also incurred the same fees.

Because the court's decision is dependent upon its earlier finding regarding the implied contract, which we found issue with *ante*, and the mandatory fees claims, which will not be part of the class considerations going forward, we cannot say substantial evidence supports the court's holding. However, because we find it appropriate to remand for further consideration of Appellants' adequacy as class representatives, the court should also reassess on remand whether the ultimate proposed class representatives are typical of the class.

D. *Superiority*

On a final note, the court did not address whether "substantial benefits from certification [exist] that render proceeding as a class superior to the alternatives." (*Brinker, supra*, 53 Cal.4th at p. 1021.) Once the court readdresses Appellants' adequacy and typicality on remand, it must address this factor.

## DISPOSITION

The order denying Appellants' class certification motion is affirmed as to its holding that Appellants' mandatory fee claims are not amenable to

class treatment.  The order is otherwise reversed.  The matter is remanded with directions to reconsider Appellants' adequacy to represent the class in light of the views expressed in this opinion.  The court must permit Appellants to amend their FAC to name alternate representatives, if necessary.  If the court approves class representatives, the court is directed to analyze typicality and superiority and certify a class, if appropriate.

The parties shall bear their own costs on appeal.


HUFFMAN, Acting P. J.

WE CONCUR:


IRION, J.


RUBIN, J.

34